FILED

2022 May-03  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan, McLane Foodservice Distribution, Inc., Employee Benefits Plan of MBM Corporation, North Central States Regional Council of Carpenters' Health Fund** | **JURY TRIAL DEMANDED** |
| **Plaintiffs** | |
| **v.** | **Case No.** |
| **Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California (Blue Cross of California, Blue Cross of Southern California and Blue Cross of Northern California are referred to herein, together, as "Anthem-CA"), and Blue Cross Blue Shield of Georgia ("Anthem-GA"), and also does business through its subsidiaries or divisions, including, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield of Connecticut ("Anthem-CT"), Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado ("Anthem-CO") and Anthem Blue Cross Blue Shield of Nevada ("Anthem-NV"), Anthem Insurance** | |

Companies, Inc. d/b/a Anthem Blue Cross Blue Shield of Indiana ("Anthem-IN"), Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky ("Anthem-KY"), Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine ("Anthem-ME"), Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company and HMO Missouri Inc. (together, "Anthem-MO"), Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire ("Anthem-NH"), Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield ("Anthem-Empire"), Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio ("Anthem-OH"), Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, ("Anthem-VA"), Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation (together, "Anthem-WI"); (2) Aware Integrated, Inc. and BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota (together "Aware"); (3) Blue Cross and Blue Shield of Alabama ("BCBS-AL"); (4) Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ"); (5) Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho ("Idaho Health"); (6) Blue Cross and Blue Shield of Kansas, Inc., also d/b/a BlueCross Blue Shield of Kansas ("BCBS-KS");  (7) Blue Cross and Blue Shield of Kansas City

("BCBS-KC"); (8) Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA"); (9) Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBS-MI"); (10) Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company ("BCBS-MS"); (11) Blue Cross and Blue Shield of North Carolina  ("BCBS-NC"); (12) Blue Cross and Blue Shield of Rhode Island ("BCBS-RI"); (13) Blue Cross and Blue Shield of South Carolina ("BCBS-SC"); (14) Blue Cross Blue Shield of Tennessee, Inc. ("BCBS-TN"); (15) Blue Cross and Blue Shield of Vermont ("BCBS-VT"); (16) Blue Cross and Blue Shield of Wyoming ("BCBS-WY"); (17) California Physicians' Service, d/b/a Blue Shield of California ("California Physicians' Service"); (18) Cambia Health Solutions, Inc., and its affiliates and/or assumed names Regence BlueShield of Idaho  ("Cambia-ID"), Regence Blue Cross Blue Shield of Oregon ("Cambia-OR"), Regence Blue Cross Blue Shield of Utah ("Cambia-UT"), and Regence Blue Shield (of Washington) ("Cambia-WA"); (19) Capital Blue Cross ("Capital"); (20) CareFirst, Inc. and its subsidiaries or affiliates Group Hospitalization and Medical Services, Inc., CareFirst of Maryland, Inc., and CareFirst BlueChoice, Inc., which collectively d/b/a CareFirst BlueCross BlueShield (CareFirst, Inc., CareFirst of Maryland, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "CareFirst-MD", and CareFirst, Inc., Group Hospitalization

**and Medical Services, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "CareFirst-DC"); (21) GoodLife Partners, Inc. and Blue Cross and Blue Shield of Nebraska (together "GoodLife"); (22) GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue (together "GuideWell"); (23) Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii ("Hawaii Medical"); (24) Health Care Service Corporation, a Mutual Legal Reserve Company d/b/a Blue Cross and Blue Shield of Illinois ("HCSC-IL"), Blue Cross and Blue Shield of Montana, ("HCSC-MT"), including its predecessor Caring for Montanans, Inc., Blue Cross and Blue Shield of New Mexico ("HCSC-NM"), Blue Cross and Blue Shield of Oklahoma ("HCSC-OK"), and Blue Cross and Blue Shield of Texas ("HCSC-TX"); (25) HealthyDakota Mutual Holdings and Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota (together "Noridian"); (26) Highmark, Inc. and Highmark Health both d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield and including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania  (together, "Highmark Northeastern PA"); Highmark Blue Cross Blue Shield Delaware Inc. d/b/a Highmark Blue Cross Blue Shield Delaware ("Highmark-DE"), Highmark West**

Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia ("Highmark-WV"); Highmark Inc. affiliates HealthNow New York Inc. and HealthNow Systems, Inc. together d/b/a Highmark Blue Cross Blue Shield of Western New York and f/d/b/a BlueCross BlueShield of Western New York ("Highmark Western NY") and Highmark Blue Shield of Northeastern New York f/d/b/a BlueShield of Northeastern New York ("Highmark Northeastern NY");  (27) Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("BCBS-NJ"); (28) Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc., and its subsidiary or division Independence Blue Cross (together "Independence"); (29) Lifetime Healthcare, Inc. and Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield (together "Excellus"); (30) Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("Louisiana Health"); (31) PREMERA and Premera Blue Cross ("Premera-WA"), which also does business as Premera Blue Cross Blue Shield of Alaska ("Premera-AK"); (32) Triple-S Management Corporation and Triple S-Salud, Inc. (together "Triple-S"); (33) USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas ("USAble"); (34) Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and

**Blue Shield of Iowa ("Wellmark-IA") and Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota ("Wellmark-SD") (collectively, "Wellmark"); and (35) the Blue Cross and Blue Shield Association ("BCBSA"),**

**Defendants**

# **COMPLAINT**

# Table of Contents

I.     **DESCRIPTION OF THE CASE**................................................8

II.    **JURISDICTION AND VENUE** ......................................11

III.   **THE PARTIES**...........................................................15

IV.   **NATIONAL ACCOUNTS, ASO SERVICES, AND THE RELEVANT MARKET** ....................................................85

V.    **HISTORY OF THE DEFENDANT INSURANCE COMPANIES AND BCBSA** ..............................................97

     **A. Development of the Blue Cross Companies** .........................98

     **B. Development of the Blue Shield Plans**.................................100

     **C. The Rise of Self-Funded Insurance** ....................................101

     **D. Creation of the Blue Cross and Blue Shield Association** .................102

VI.   **CONTROL OF BCBSA BY DEFENDANT INSURANCE COMPANIES**........................................................112

VII.  **LICENSE AGREEMENTS AND RESTRAINTS ON COMPETITION**........................................................117

VIII. **THE HORIZONTAL AGREEMENTS NOT TO COMPETE**............123

IX.   **THE BCBSA LICENSE AGREEMENTS HAVE INJURED COMPETITION FOR NATIONAL ACCOUNTS THROUGHOUT THE UNITED STATES**........................................................134

X.    **DEFENDANTS' CONDUCT HAS NO PROCOMPETITIVE JUSTIFICATIONS**........................................................137

**XI.**   **THE PUTATIVE SUBSCRIBER CLASS ACTION SETTLEMENT**.................................................139

**XII.**   **TOLLING OF THE STATUTE OF LIMITATIONS**..........................141

**XIII.**   **VIOLATIONS ALLEGED** .......................................................141

   **Count One** (*Per Se* Violations of § 1 of the Sherman Act)........................141

   **Count Two** (Rule of Reason Violations of § 1 of the Sherman Act).........143

**XIV.**   **RELIEF REQUESTED** ............................................................148

Plaintiffs JetBlue Airways Corporation, JetBlue Airways Group Health Insurance Plan, The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan, McLane Foodservice Distribution, Inc., and Employee Benefits Plan of MBM Corporation, North Central States Regional Council of Carpenters' Health Fund (collectively referred to herein as "Plaintiffs") are all "National Accounts,"[1] *i.e.*, large group employers, sponsors, administrators and/or health benefits plans that provide coverage to more than 5,000 plan members spread over at least two states, who purchase or have purchased health insurance services from one or more of the Defendants.

Plaintiffs, for their complaint against Defendants: (1) Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California (Blue Cross of California, Blue Cross of Southern California and Blue Cross of Northern California are referred to herein, together, as "Anthem-CA"), and Blue Cross Blue Shield of Georgia ("Anthem-GA"), and also does business through its subsidiaries or divisions, including, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield of Connecticut ("Anthem-CT"), Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado ("Anthem-

---

[1]      *See United States v. Anthem*, 236 F. Supp. 3d 171, 179 (D.D.C. 2017).  National Accounts are the larger of two types of "large employer" plans.  *Id.* at 188.  While some insurance companies utilize a numeric threshold other than 5,000 employees to define a National Account, for purposes of this complaint Plaintiffs generally rely on the same 5,000 employee threshold used by the United States in *Anthem*.  *See id.* at 179.

CO") and Anthem Blue Cross Blue Shield of Nevada ("Anthem-NV"), Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross Blue Shield of Indiana ("Anthem-IN"), Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky ("Anthem-KY"), Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine ("Anthem-ME"), Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company and HMO Missouri Inc. (together, "Anthem-MO"), Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire ("Anthem-NH"), Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield ("Anthem-Empire"), Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio ("Anthem-OH"), Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, ("Anthem-VA"), Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation (together, "Anthem-WI"); (2) Aware Integrated, Inc. and BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota (together "Aware"); (3) Blue Cross and Blue Shield of Alabama ("BCBS-AL"); (4) Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ"); (5) Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho ("Idaho Health"); (6) Blue Cross and Blue Shield of Kansas, Inc., also d/b/a BlueCross Blue Shield of Kansas ("BCBS-KS");  (7) Blue Cross and Blue Shield of Kansas City ("BCBS-KC"); (8) Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA"); (9) Blue Cross Blue Shield of Michigan

Mutual Insurance Company ("BCBS-MI"); (10) Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company ("BCBS-MS"); (11) Blue Cross and Blue Shield of North Carolina  ("BCBS-NC"); (12) Blue Cross and Blue Shield of Rhode Island ("BCBS-RI"); (13) Blue Cross and Blue Shield of South Carolina ("BCBS-SC"); (14) Blue Cross Blue Shield of Tennessee, Inc. ("BCBS-TN"); (15) Blue Cross and Blue Shield of Vermont ("BCBS-VT"); (16) Blue Cross and Blue Shield of Wyoming ("BCBS-WY"); (17) California Physicians' Service, d/b/a Blue Shield of California ("California Physicians' Service"); (18) Cambia Health Solutions, Inc., and its affiliates and/or assumed names Regence BlueShield of Idaho  ("Cambia-ID"), Regence Blue Cross Blue Shield of Oregon ("Cambia-OR"), Regence Blue Cross Blue Shield of Utah ("Cambia-UT"), and Regence Blue Shield (of Washington) ("Cambia-WA"); (19) Capital Blue Cross ("Capital"); (20) CareFirst, Inc. and its subsidiaries or affiliates Group Hospitalization and Medical Services, Inc., CareFirst of Maryland, Inc., and CareFirst BlueChoice, Inc., which collectively d/b/a CareFirst BlueCross BlueShield (CareFirst, Inc., CareFirst of Maryland, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "CareFirst-MD", and CareFirst, Inc., Group Hospitalization and Medical Services, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "CareFirst-DC"); (21) GoodLife Partners, Inc. and Blue Cross and Blue Shield of Nebraska (together "GoodLife"); (22) GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue (together "GuideWell"); (23) Hawaii Medical

Service Association d/b/a Blue Cross and Blue Shield of Hawaii ("Hawaii Medical"); (24) Health Care Service Corporation, a Mutual Legal Reserve Company d/b/a Blue Cross and Blue Shield of Illinois ("HCSC-IL"), Blue Cross and Blue Shield of Montana, ("HCSC-MT"), including its predecessor Caring for Montanans, Inc., Blue Cross and Blue Shield of New Mexico ("HCSC-NM"), Blue Cross and Blue Shield of Oklahoma ("HCSC-OK"), and Blue Cross and Blue Shield of Texas ("HCSC-TX"); (25) HealthyDakota Mutual Holdings and Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota (together "Noridian"); (26) Highmark, Inc. and Highmark Health both d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield and including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania  (together, "Highmark Northeastern PA"); Highmark Blue Cross Blue Shield Delaware Inc. d/b/a Highmark Blue Cross Blue Shield Delaware ("Highmark-DE"), Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia ("Highmark-WV"); Highmark Inc. affiliates HealthNow New York Inc. and HealthNow Systems, Inc. together d/b/a Highmark Blue Cross Blue Shield of Western New York and f/d/b/a BlueCross BlueShield of Western New York ("Highmark Western NY") and Highmark Blue Shield of Northeastern New York f/d/b/a BlueShield of Northeastern New York ("Highmark Northeastern NY");  (27) Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("BCBS-NJ"); (28) Independence Health Group,

Inc. and Independence Hospital Indemnity Plan, Inc., and its subsidiary or division Independence Blue Cross (together "Independence"); (29) Lifetime Healthcare, Inc. and Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield (together "Excellus"); (30) Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("Louisiana Health"); (31) PREMERA and Premera Blue Cross ("Premera-WA"), which also does business as Premera Blue Cross Blue Shield of Alaska ("Premera-AK"); (32) Triple-S Management Corporation and Triple S-Salud, Inc. (together "Triple-S"); (33) USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas ("USAble"); (34) Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark-IA") and Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota ("Wellmark-SD") (collectively, "Wellmark"); (collectively, the "Defendant Insurance Companies"); and (35) the Blue Cross and Blue Shield Association ("BCBSA") (together, "Defendants" or "Defendant Co-Conspirators"), allege as follows:

## I.     DESCRIPTION OF THE CASE

1.     This is an action brought under the Federal antitrust laws to address collusion among separate economic actors that should compete with one another for the sale of certain health insurance services to Plaintiffs and others.  This action is brought by employers, plan sponsors, plan administrators, and trustees on behalf of

group health plans who—either directly themselves or through agents such as their health plans—contract with and purchase administrative services[2] from one or more of the Defendant Insurance Companies.   These employers, plan sponsors, plan administrators, trustees, plans and associations seek to recover damages and other relief arising from a continuing conspiracy between and among Defendant Insurance Companies and BCBSA to restrict output and allocate customers across the United States in violation of § 1 of the Sherman Act (15 U.S.C. § 1) and causing damages under § 4 of the Clayton Act (15 U.S.C. § 15).   Such damages include the difference between what Plaintiffs paid individual Defendant Insurance Companies for ASO services and the lower competitive prices they would have paid but for Defendant Insurance Companies' illegal conduct described herein.

2.      The individual Defendant Insurance Companies, which own and jointly control BCBSA, are engaged in interstate commerce and in activities substantially affecting interstate commerce.   The unlawful conduct alleged herein substantially affects interstate commerce. Each Defendant Insurance Company has agreed, with each of the other Defendant Insurance Companies by, with and through the BCBSA,

---

[2]      Plaintiffs are either sponsors/administrators of or are self-insured group plans.   Under such plans, the group contracts with an insurance company to administer the plan, but the group bears some or all of the risk associated with offering health benefits.   Defendants act under these contracts as an administrator of the plan, the plan's benefits, or both, in full or in part.   This type of contract is commonly referred to as an "administrative services only" agreement or an "ASO" agreement.   *See, e.g., In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016); *also see* ¶ 269, *infra*.   ASO services, as used in this complaint, encompasses all forms of administrative services, including joint administrative arrangements and network administration agreements.

to allocate national account customers and refrain from competing against each other to provide Blue Cross and/or Blue Shield branded ASO services to such customers, including Plaintiffs.   In addition to allocating customers, the Defendant Co-Conspirators have combined and conspired to implement additional output-reducing restraints on the Defendant Insurance Companies' ability to compete against each other or other non-defendant insurance conspirators for the sale of ASO services. Among other restrictive output-reducing agreements, the Defendant Insurance Companies and BCBSA have agreed to adhere to (1) a National Best Efforts Rule, which precludes each Defendant from obtaining more than 33% of its revenue from the sale of services that do not carry a Blue Cross or Blue Shield brand or trademark and (2) a Local Best Efforts Rule, which requires that 80% of the revenue received by a Defendant Insurance Company from within an allocated territory come from the sale of services using a Blue Cross and/or Blue Shield mark.  The effect and intention of these restraints is to essentially ban all competition among Defendant Insurance Companies for National Accounts.

3.      Defendant Insurance Companies provide commercial health insurance and insurance-related services, including ASO services, that cover residents of their respective allocated geographic territories (which together include all 50 states and Puerto Rico), sell those insurance services to National Accounts across state lines, provide access and payments to providers for covered individuals when those persons travel across state lines, purchase health care in interstate commerce when

covered individuals seek health care out of state, and receive payments from the employers, plan sponsors, plan administrators, trustees, and health plans located in other states on behalf of covered individuals.

4.      The Defendant Insurance Companies' anticompetitive conduct has resulted in supracompetitive fees and prices being charged to National Accounts, such as Plaintiffs. This anticompetitive behavior and the lack of competition engineered by Defendant Co-Conspirators through their customer allocation scheme and/or output restrictions have caused Plaintiffs to pay Defendant Insurance Companies and other competitors supracompetitive prices for ASO services.

5.      These inflated prices and fees would not have been charged but for the illegal customer allocation scheme and/or output restrictions agreed to by and between the Defendant Insurance Companies and the BCBSA.  The illegal conduct has had the actual and intended effect of restricting the ability of a significant portion of the nation's largest health insurance companies from competing with each other for the provision of ASO services to customers such as the Plaintiffs.

## II.    <u>JURISDICTION AND VENUE</u>

6.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against the Defendant Co-Conspirators for the

injuries sustained by Plaintiffs by reason of the violations, as hereinafter alleged, of § 1 of the Sherman Act (15 U.S.C. § 1).

7.     This Court has personal jurisdiction over each Defendant Co-Conspirator pursuant to § 12 of the Clayton Act (15 U.S.C. § 22) under one or more of the theories below:

a.     As the MDL Court previously found, Defendant Co-Conspirators "have conducted substantial business in this district" (DE# 925, Case No. 2:13-cv-20000-RDP, at 24); and/or

b.     As the MDL Court previously found, Defendant Co-Conspirators "all have subscribers throughout the United States (including some within in the Northern District), they all have entered into the BlueCard Program in order to access a nationwide provider network, and they all settle (and have settled) claims made by providers in the Northern District through the BlueCard Program" (DE# 925, Case No. 2:13-cv-20000-RDP, at 32); and/or

c.     As the MDL Court previously found, Defendant Co-Conspirators can "not demonstrate[] that they face 'constitutionally significant inconvenience' from participating in these actions, and the court's exercise of personal jurisdiction pursuant to Section 12 of the Clayton Act accordingly comports

with the Fifth Amendment's Due Process Clause" (DE# 925, Case No. 2:13-cv-20000-RDP, at 40); and/or

d.  As the MDL Court previously found, Defendant Co-Conspirators' conspiracy is analyzed under the *per se* standard of review and this conspiracy, entered into by all Defendants, involved injury in the state of Alabama and "the overt acts committed by BCBS-AL in furtherance of the alleged conspiracies demonstrate a substantial connection between those conspiracies and Alabama" (DE# 925, Case No. 2:13-cv-20000-RDP, at 50); and/or

e.  Each Defendant Co-Conspirator has purposefully availed itself of the privilege of conducting business activities within this District (and has the requisite minimum contacts with the State of Alabama) because each Defendant Co-Conspirator committed intentional acts that were intended to cause and did cause injury within this District; and/or

f.  Each Defendant Insurance Company has purposefully availed itself of the privilege of conducting business activities within this District (and has the requisite minimum contacts with the State of Alabama); and/or

g.  Each Defendant Insurance Company has purposefully availed itself of the privilege of conducting business activities within this District (and has the requisite minimum contacts with the State of Alabama) because each Defendant Insurance Company transacts business within this District by processing and/or paying health care claims for services provided within this District; and/or

h.  One or more Plaintiffs have substantial presence within this District, including numerous employees, and each of the Defendants have adhered to and enforced an illegal agreement designed to cause harm to Plaintiffs within this District, including a joint boycott to not bid on Plaintiffs' business.

8.    For the same reasons explained above and as also previously found by the MDL Court (*see* DE# 925, Case No. 2:13-cv-20000-RDP, at 59-62), venue is also proper in this district pursuant to §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

9.    This action is also instituted to secure divisible and individualized injunctive relief against Defendant Co-Conspirators to prevent them from further harming Plaintiffs in violation of § 1 of the Sherman Act as hereinafter alleged.  For clarity, Plaintiffs are not seeking injunctive relief on behalf of anyone except themselves and do not seek any injunctive relief that infringes upon the Rule 23(b)(2)

11

indivisible injunctive relief proposed in the putative subscriber class action settlement (the "MDL Action") in *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*, Case No. 2:13-cv-20000-RDP (N.D. Ala.) (the "MDL Court").  The MDL Court has explained that "a Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief." (DE# 2897, Case No. 2:13-cv-20000-RDP (N.D. Ala.)).  As the MDL Court has further explained, "[t]he relief a Rule 23(b)(3) opt out may pursue is limited only to the extent that such relief may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court."  (*Id.*)

## III.  <u>THE PARTIES</u>

**Plaintiffs**

### A. JetBlue

10.    JetBlue Airways Corporation ("JetBlue") is a Delaware corporation with its with its principal place of business at Queens Plaza North, Long Island City, NY.  It operates the seventh largest passenger airline in the United States and serves more than 14 million customers in 107 destinations and 26 countries. For the year ended 2019, JetBlue had revenues of over $8 billion.

11.    Plaintiff JetBlue Airways Group Health Insurance Plan ("JetBlue Plan") is a health plan sponsored by JetBlue.  Since at least January 1, 2008, the Plan has been administered from New York. JetBlue provides its employees and their dependents with self-insured health-care benefits as a component of the Plan.

JetBlue has engaged a third-party vendor to administer the plan through an ASO Services contract.

12. JetBlue, and/or the JetBlue Plan have purchased such ASO Services from Defendant Anthem every year from at least 2008 through 2021. Plaintiffs JetBlue and/or the JetBlue Plan paid more for ASO Services than they would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and have been injured by the Defendants' conduct as a result thereof. Therefore, Plaintiffs JetBlue and/or the JetBlue Plan have purchased ASO Services, have been damaged by Defendants' conduct, and have a right to bring these claims. JetBlue and/or the JetBlue Plan have standing and have sustained antitrust injury.

**B. Kraft Heinz**

13. Plaintiff The Kraft Heinz Foods Company is a Pennsylvania corporation with its headquarters in Pittsburgh, Pennsylvania and Chicago, Illinois. The Kraft Heinz Food Company was formed in 2015 through the merger of Kraft Foods Group and H.J. Heinz Company. Kraft Foods Group, H.J. Heinz Company and The Kraft Heinz Foods Company are collectively referred to as "KHFC" and shall be considered Plaintiffs for this action.

14. KHFC is the third largest food and beverage company in North America and part of the fifth largest food and beverage company in the world. KHFC has

more than 19,000 employees in the U.S.  For the year ended December 2020, KHFC had net U.S. sales of approximately $19.2 billion.

15.     Plaintiffs Kraft Heinz Company Group Benefits Plan and Kraft Heinz Company Retiree Group Benefits Plan (collectively, "KHFC Plans") are health benefits plans that KHFC has sponsored from at least as early as January 1, 2017 through present.  Prior to 2017, the health plans sponsored by KHFC, including the legacy companies, were known as: Kraft Foods Global, Inc. Group Benefit Plan; Kraft Foods Group, Inc. Retiree Health and Life Benefits Plan; Group Benefit Program for Collectively-Bargained Active Employees; Group Benefit Program for Collectively-Bargained Retired Employees; Group Benefit Program for Non-Bargaining Active; Group Benefit Program for Non-Bargaining Active Employees; Group Benefit Program for Bargaining Employees; and Group Benefit Program for Non-Bargaining Retired Employees.  These legacy plans shall be included as Plaintiffs in this action and shall be included in the definition of KHFC Plan.  The KHFC Plans have been based in and administered from Pittsburgh, Pennsylvania and Chicago, Illinois.  KHFC is a National Account and provides its eligible employees and their dependents with health-care benefits through the KHFC Plans, a self-insured health care plan.  The KHFC Plans engage third-party vendors to administer the plan through ASO Services contracts.

16.     KHFC and/or the KHFC Plans have purchased such administrative services from Defendants HCSC-IL and Highmark.  Plaintiffs KHFC and/or the

KHFC Plans paid more for ASO Services than they would have paid in a competitive market free from Defendants' agreement not to compete for National Accounts and have been injured by the Defendants' conduct as a result thereof.  Plaintiffs KHFC and/or the KHFC Plans therefore have purchased ASO Services, have been damaged by Defendants' conduct, and have a right to bring these claims.  KHFC and/or the KHFC Plans have standing and have sustained antitrust injury.

### C. McLane

17.    Plaintiff McLane Foodservice Distribution, Inc. (MFSD) is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. Prior to November 1, 2018, MFSD was known as Meadowbrook Meat Company, Inc. (Meadowbrook). MFSD is a wholly-owned subsidiary of McLane Company, Inc., which McLane Company, Inc. acquired in 2012.

18.    Meadowbrook sponsored a health plan named the Employee Benefits Plan of MBM Corporation (MBM Plan). Beginning in early 2015, participants in the MBM Plan were moved to the McLane Company, Inc. Welfare Plan, with all Meadowbrook employees migrated to the McLane Company, Inc. Welfare Plan by late 2015. MFSD provided its teammates and their dependents with health-care benefits through the MBM Plan, which was a self-insured health care plan. The MBM Plan engaged third-party vendors to administer the plan through ASO Services contracts.

19.     The MBM Plan purchased such administrative services from Defendant BCBS-NC every year since at least 2008 through 2015. Plaintiff MFSD and/or the MBM Plan paid more for ASO Services than they would have paid in a competitive market free from Defendants' agreement not to compete for National Accounts and have been injured by the Defendants' conduct as a result thereof. Therefore, Plaintiffs MFSD and the MBM Plan have purchased ASO Services, have been damaged by Defendants' conduct, and have a right to bring these claims. Each of MFSD and the MBM Plan have standing and have sustained antitrust injury.

**D. North Central States Regional Council of Carpenters' Health Fund**

20.     Plaintiff North Central States Regional Council of Carpenters' Health Fund is a multi-employer "welfare plan" as defined under 29 U.S.C. § 1002. The fund is located at NCSRCC Benefit Funds P.O. Box 4002, Eau Claire, WI 54702.

21.     Plaintiff also includes health benefits plan(s) that the North Central States Regional Council of Carpenters' Health Fund has sponsored from January 1963 through present (collectively, "NCSRCC Fund"). The NCSRCC Fund provides its eligible members and their dependents with health-care benefits through the NCSRCC Fund, which is a self-insured health care plan. The NCSRCC Fund is maintained and administered from Eau Claire, Wisconsin. The NCSRCC Fund maintains a self-administered plan office to administer the plan's preferred provider network through an ASO Services contract since November 2011.

22.    The NCSRCC Fund purchased such administrative services from Defendant Anthem. The NCSRCC Fund paid more for ASO Services than it would have paid in a competitive market as a result of Defendants' agreement not to compete for National Accounts and has been injured by the Defendants' conduct as a result thereof. The NCSRCC Fund therefore has purchased ASO Services, has been damaged by Defendants' conduct, and has a right to bring these claims. The NCSRCC Fund has standing and has sustained antitrust injury.

**Defendants/Co-Conspirators**

23.    **BCBSA** is a not-for-profit corporation organized under the state of Illinois and headquartered in Chicago, Illinois.  It is owned and controlled by the Defendant Insurance Companies that use Blue Cross and Blue Shield trademarks and trade names. BCBSA was created and maintained by these companies in furtherance of their unlawful conspiracy under the guise of licensing themselves the marks previously used by them.

24.    The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

25.    BCBSA has contacts with all 50 states, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the individual Defendant Insurance Companies.  In particular, BCBSA has entered into agreements with

Defendant Insurance Companies that control the geographic areas in which the individual Defendant Insurance Companies can compete. These agreements and resulting conspiracy restrict output and allocates the market for ASO Services to National Accounts on a nationwide basis in violation of § 1 of the Sherman Act (the "Blue conspiracy").

26.     Defendant Insurance Companies provide health insurance coverage for over 100 million - or one in three - Americans. A Defendant Insurance Company is the largest health insurer, as measured by number of subscribers, in 44 states.

27.     **Anthem-CA** has agreed to and participates in the Blue conspiracy using Blue Cross trademark and trade name in California where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

28.     The principal headquarters for Anthem-CA is located at One Wellpoint Way, Thousand Oaks, CA 91362.

29.     **Anthem-CO** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Colorado where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

30.     The principal headquarters for Anthem-CO is located at 700 Broadway, Denver, CO 80203.

31.     **Anthem-CT** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Connecticut where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

32.     The principal headquarters for Anthem-CT is located at 370 Bassett Road, North Haven, CT 06473.

33.     **Anthem-Empire** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Eastern and Southeastern New York where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

34.     The principal headquarters for Anthem-Empire is located at One Liberty Plaza, New York, NY 10006.

35.     **Anthem-GA** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Georgia where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

36.     The principal headquarters for Anthem-GA is located at 3350 Peachtree Road NE, Atlanta, GA 30326.

37.     **Anthem-IN** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Indiana where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

38.     The principal headquarters for Anthem-IN is located at 120 Monument Circle, Indianapolis, IN 46204.

39.     **Anthem-KY** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kentucky where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

40.     The principal headquarters for Anthem-KY is located at 13550 Triton Park Blvd., Louisville, KY 40223.

41.     **Anthem-ME** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maine where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

42.     The principal headquarters for Anthem-ME is located at 2 Gannett Drive, South Portland, ME 04016.

43.   **Anthem-MO** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Missouri, except for 32 counties in greater Kansas City and NW Missouri.  Anthem-MO is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the state of Missouri, except the 32 counties in greater Kansas City and NW Missouri.

44.   The principal headquarters for Anthem-MO is located at 1831 Chestnut Street, St. Louis, MO 63103.

45.   **Anthem-NH** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Hampshire where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

46.   The principal headquarters for Anthem-NH is located at 3000 Goffs Falls Rd, Manchester, NH 03103.

47.   **Anthem-NV** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nevada where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

48.   The principal headquarters for Anthem-NV is located at 9133 West Russell Rd. Suite 200, Las Vegas, NV 89148.

49.     **Anthem-OH** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Ohio where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

50.     The principal headquarters for Anthem-OH is located at 120 Monument Circle, Indianapolis, IN 46203.

51.     **Anthem-VA** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in most of Virginia, with the exception of a small portion of Northern Virginia in the Washington, DC suburbs.   Anthem-VA is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the state of Virginia, excepting a small portion of Northern Virginia in the Washington, DC suburbs.

52.     The principal headquarters for Anthem-VA is located at 2235 Staples Mill Road, Suite 401, Richmond, VA 23230.

53.     **Anthem-WI** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wisconsin where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

54.     The principal headquarters for Anthem-WI is located at 120 Monument Circle, Indianapolis, IN 46204.

55.     **Aware** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Minnesota where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

56.     The principal headquarters for Aware is located at 3535 Blue Cross Road, St. Paul, MN 55164.

57.     **BCBS-AL** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the state of Alabama where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

58.     The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, AL 35244.

59.     **BCBS-AZ** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Arizona where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

60.    The principal headquarters for BCBS-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021.

61.    **BCBS-KC** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas. BCBS-Kansas City is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas.

62.    The principal headquarters for BCBS-Kansas City is located at 2301 Main Street, One Pershing Square, Kansas City, MO 64108.

63.    **BCBS-KS** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kansas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

64.    The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard, Topeka, KS 66629.

65.    **BCBS-MA** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Massachusetts where it, like many other Defendant Insurance Companies in their allocated areas, is the

largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

66.     The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, MA 02215.

67.     **BCBS-MI** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Michigan where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

68.     The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd., Detroit, MI 48226.

69.     **BCBS-MS** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Mississippi where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

70.     The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive, Flowood, MS 39232.

71.     **BCBS-NC** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Carolina where it, like many other Defendant Insurance Companies in their allocated areas, is the

largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

72.     The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road, Durham, NC 27707.

73.     **BCBS-NJ** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Jersey where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

74.     The principal headquarters for BCBS-NJ is located at Three Penn Plaza East, Newark, NJ 07105.

75.     **BCBS-RI** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Rhode Island where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

76.     The principal headquarters for BCBS-RI is located at 500 Exchange Street, Providence, RI 02903.

77.     **BCBS-SC** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Carolina where it, like many other Defendant Insurance Companies in their allocated areas, is the

largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

78.     The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, SC 29212.

79.     **BCBS-TN** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Tennessee where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

80.     The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle, Chattanooga, TN 37402.

81.     **BCBS-VT** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Vermont where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

82.     The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin, VT 05602.

83.     **BCBS-Western New York** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western New York where it is one of the largest health insurers, as measured by number of

subscribers, within its exclusive, protected service area, which is defined as Western New York state.

84.    The principal headquarters for BCBS-Western New York is located at 257 West Genesee Street, Buffalo, NY 14202.

85.    **BCBS-WY** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wyoming where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

86.    The principal headquarters for BCBS-WY is located at P.O. Box 2266, Cheyenne, WY 82003.

87.    **California Physicians' Service** has agreed to and participates in the Blue conspiracy using Blue Shield trademark and trade name in California where it is one of the largest health insurers, as measured by number of subscribers, within its protected service area.

88.    The principal headquarters for California Physicians' Service is located at 50 Beale Street, San Francisco, CA 94105-1808.

89.    **Cambia-ID** has agreed to and participates in the Blue conspiracy using Blue Shield trademark and trade name in Idaho where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

90.     The principal headquarters for Cambia-ID is located at 1602 21st Ave, Lewiston, ID 83501.

91.     **Cambia-OR** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oregon where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

92.     The principal headquarters for Cambia-OR is located at 100 SW Market Street, Portland, OR 97207.

93.     **Cambia-UT** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Utah where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

94.     The principal headquarters for Cambia-UT is located at 2890 East Cottonwood Parkway, Salt Lake City, UT 84121.

95.     **Cambia-WA** has agreed to and participates in the Blue conspiracy using Blue Shield trademarks and trade names in Washington where it one of the largest health insurers, as measured by number of subscribers, within its protected service area.

96.     The principal headquarters for Cambia-WA is located at 1800 Ninth Avenue, Seattle, WA 98111.

97.    **Capital** has agreed to and participates in the Blue conspiracy using Blue Cross trademark and trade name in central Pennsylvania where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the 21 counties that make up central Pennsylvania: Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties.

98.    The principal headquarters for Capital is located at 2500 Elmerton Avenue, Harrisburg, PA 17177.

99.    **CareFirst-DC** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Washington, DC and its suburbs where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

100.   The principal headquarters for CareFirst-DC is located at 10455 Mill Run Circle, Owings Mill, MD 21117.

101.   **CareFirst-MD** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maryland where it, like many other Defendant Insurance Companies in their allocated areas, is the

largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

102.   The principal headquarters for CareFirst-MD is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117.

103.   **Excellus** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in central New York where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as 31 counties in central New York.

104.   The principal headquarters for Excellus is located at 165 Court Street, Rochester, NY 14647.

105.   **GoodLife** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nebraska where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

106.   The principal headquarters for GoodLife is located at 1919 Aksarban Drive, Omaha, NE 68180.

107.   **GuideWell** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Florida where it, like many other Defendant Insurance Companies in their allocated areas, is the largest

health insurer, as measured by number of subscribers, within its exclusive, protected service area.

108.   The principal headquarters for GuideWell is located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.

109.   **Hawaii Medical** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Hawaii where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

110.   The principal headquarters for Hawaii Medical is located at 818 Keeaumoku Street, Honolulu, HI 96814.

111.   **HCSC-IL** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Illinois where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

112.   The principal headquarters for HCSC-IL is located at 300 E. Randolph Street, Chicago, IL 60601.

113.   **HCSC-MT** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Montana where it is one of the largest health insurers, as measured by number of subscribers, within its

exclusive, protected service area. Defendant Health Care Service Corporation acquired Blue Cross and Blue Shield of Montana in 2012. Health Care Service Corporation has assumed liability for claims involving Blue Cross and Blue Shield of Montana prior to the 2012 acquisition.

114. The principal headquarters for HCSC-MT is located at 560 N. Park Avenue, Helena, MT 59604-4309.

115. **HCSC-NM** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Mexico where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

116. The principal headquarters for HCSC-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, NM 87113.

117. **HCSC-OK** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oklahoma where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

118. The principal headquarters for HCSC-OK is located at 1400 South Boston, Tulsa, OK 74119.

119.   **HCSC-TX** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Texas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

120.   The principal headquarters for HCSC-TX is located at 1001 E. Lookout Drive, Richardson, TX 75082.

121.   **Highmark-DE** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Delaware where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

122.   The principal headquarters for Highmark-DE is located at 800 Delaware Avenue, Wilmington, DE 19801.

123.   **Highmark Northeastern NY** has agreed to and participates in the Blue conspiracy using Blue Shield trademark and trade name in Northeastern New York where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as 13 counties in Northeastern New York.

124.   The principal headquarters for Highmark Northeastern NY is located at 257 West Genesee Street, Buffalo, NY 14202.

125.   **Highmark Northeastern PA** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania and Blue Shield trademarks and trade names throughout the entire state of Pennsylvania.  Highmark Northeastern PA is the largest health insurer, as measured by number of subscribers, within its Blue Cross and Blue Shield exclusive, protected service area, which is defined as the 29 counties of Western Pennsylvania: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Green, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties.

126.   The principal headquarters for Highmark Northeastern PA is located at 120 Fifth Avenue Place, Pittsburgh, PA 15222.

127.   **Highmark-WV** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in West Virginia where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

128.   The principal headquarters for Highmark-WV is located at 700 Market Square, Parkersburg, West Virginia 26101.

129.   **Idaho Health** has agreed to and participates in the Blue conspiracy using Blue Cross trademark and trade name in Idaho where it, like many other

Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

130.   The principal headquarters for Idaho Health is located at 3000 East Pine Avenue, Meridian, ID 83642.

131.   **Independence** has agreed to and participates in the Blue conspiracy using Blue Cross trademark and trade name in Southeastern Pennsylvania where it is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the 5 counties that make up Southeastern Pennsylvania: Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.

132.   The principal headquarters for Independence is located at 1901 Market Street, Philadelphia, PA 19103.

133.   **Louisiana Health** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Louisiana where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

134.   The principal headquarters for Louisiana Health is located at 5525 Reitz Avenue, Baton Rouge, LA 70809.

135.   **Noridian** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Dakota where it,

like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

136.   The principal headquarters for Noridian is located at 4510 13th Avenue South, Fargo, ND 58121.

137.   **Premera-AK** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Alaska where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

138.   The principal headquarters for Premera Blue Cross Blue Shield of Alaska is located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.

139.   **Premera-WA** has agreed to and participates in the Blue conspiracy using Blue Cross trademarks and trade names in the state of Washington where it is one of the largest health insurers, as measured by number of subscribers, within its protected service area.

140.   The principal headquarters for Premera Blue Cross is located at 7001 220th Street SW, Mountlake Terrace, WA 98043-4000.

141.   **Triple-S** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Puerto Rico where it is

one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

142.   The principal headquarters for Triple-S is located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.

143.   **USAble** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Arkansas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

144.   The principal headquarters for USAble is located at 601 S. Gaines Street, Little Rock, Arkansas, 72201.

145.   **Wellmark-IA** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Iowa where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

146.   The principal headquarters for Wellmark-IA is located at 1331 Grand Avenue, Des Moines, IA 50306.

147.   **Wellmark-SD** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Dakota where it, like many other Defendant Insurance Companies in their allocated areas,

is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

148.   The principal headquarters for Wellmark-SD is located at 1601 W. Madison, Sioux Falls, SD 57104.

## IV.   NATIONAL ACCOUNTS, ASO SERVICES, AND THE RELEVANT MARKET

149.   The Defendant Insurance Companies offer a range of health insurance products to their customers.  Generally, these customers, depending on their size, utilize one of two types of health insurance for their employees and plan participants: fully-insured or self-insured.  The Defendant Insurance Companies sell insurance services to both fully-insured plans (typically to smaller employers) and to self-insured plans (typically offered by larger employers and plans).  The Plaintiffs in this case are all self-insured health insurance plans, or provide self-funded medical coverage and purchase administrative services only ("ASO") from the Defendant Insurance Companies.  These plans are referred to as "ASO plans."

150.   The Defendant Insurance Companies and other health insurers and third-party administrators generally classify customers as "small group" or "large group" employers.  Within the "large group" category, Defendant Insurance Companies and other insurance industry participants recognize large, multi-site employers or plans typically covering 5,000 or more employees as a distinct group

that are referred to as "National Accounts."[3]   The sale of commercial health insurance services to National Accounts is recognized as a distinct economic market by the individual Defendant Insurance Companies and other health insurers, many of which have separate business units dedicated to National Accounts.  It is also recognized as a separate economic market by the consuming public, including the National Accounts themselves.  Sales of insurance services to National Accounts are not reasonably interchangeable with the sales of insurance services to smaller accounts and do not exhibit a high degree of cross-elasticity of demand with such accounts.

151.   By virtue of their size and geographic dispersion, National Accounts have a number of unique needs and characteristics that has led the health insurance industry to treat them as a separate economic category with distinct services and pricing.  Insurers identify and target National Accounts based on these attributes, and many other actors in the insurance space generally do not and cannot target National Accounts because of these attributes.  Accordingly, only the Defendant Insurance Companies, United HealthCare Service, Cigna, and Aetna are generally able to service the business of National Accounts.  Defendant Insurance Companies have a share of at least 50 percent of the National Account market.

---

[3]       *See* footnote 1, *supra*.

152.   Most National Accounts self-insure, which means they assume the risk and cost of covered medical services used by their covered individuals.  National Accounts facilitate this self-insurance coverage by purchasing ASO services pursuant to which third parties (such as Defendant Insurance Companies) manage the day-to-day administration of customers' health plans and grant the covered individuals access to their medical provider network(s).

153.   Payments for services from self-insured National Accounts to insurers under ASO contracts are known as "ASO fees."  ASO fees form a significant part of the negotiations between ASO service providers and National Accounts, but they are not the only source of revenue and profit for the ASO service provider.  ASO contracts with National Accounts generate significant profit for insurers beyond just the ASO fees.

154.   Competition between insurers for ASO National Account contracts allows employers, plan sponsors, plan administrators, trustees, and plans to obtain more favorable prices, provider networks, plan designs, and service levels.

155.   There is a relevant product market for the sale of commercial health insurance services to National Accounts with 5,000 members or more spread across two or more states.  The relevant geographic market is the entire United States. *See United States v. Anthem*, 236 F. Supp. 3d 171, 193-202 (D.D.C. 2017) (finding that the relevant product market for consideration of the proposed Anthem/Cigna merger was the sale of commercial health insurance to National Accounts with 5,000

employees or more spread across two or more states).  It is the relevant market made up of that product market and that geographic market that has been unreasonably injured by the unlawful conduct alleged herein.

156.   Plaintiffs are National Accounts as that term has been defined by the case law, and as it is commonly used in the insurance industry and by Defendant Insurance Companies.  Plaintiffs self-insure and obtain ASO bids through requests for proposals and similar bidding processes and/or requests for competitive pricing ("RFPs") and enter into ASO contracts.  Each Plaintiff entered into a new or renewal ASO contract or otherwise conducted negotiations and/or market reviews within the relevant time period.  All have utilized RFPs or other competitive mechanisms for obtaining ASO services, for which the Defendant Insurance Companies have agreed among themselves to limit competition.

157.   As owners of the BCBSA, Defendant Insurance Companies, both among themselves and with the BCBSA, have agreed to allocate customers and markets, restrict output, and eliminate the ability of Defendant Insurance Companies to compete against each other for the business of National Accounts.  The illegal market or customer allocation and the output-reducing National Best Efforts Rule and Local Best Efforts Rule are enforced by the BCBSA through the BCBSA license and membership agreements.  Under those agreements, any Defendant Insurance Company that competes against one of its co-conspirators to obtain the business of a National Account contrary to their agreement could lose its license to use the Blue

trade name and/or trademarks and would have to pay substantial penalties to the other Defendant Insurance Companies through the BCBSA.

158.   Each of the individual Defendant Insurance Companies enters into a license agreement with BCBSA to use the Blue brand to sell commercial health insurance services in an "exclusive service area" (each, an "Allocated Territory"). Under the rules agreed to by Defendants, with certain limited exceptions, the Defendant Insurance Company allotted the Allocated Territory in which an employer or plan is headquartered is the only Defendant Insurance Company that is allowed to or will bid to provide insurance services to that employer or to other employers or plans located in the Allocated Territory.  Each Defendant Insurance Company also explicitly agrees in the BCBSA license agreement that it will not enter any territory allocated to another Defendant Insurance Company and compete against that Defendant by offering Blue-branded insurance services to any account that is headquartered in that territory.  Even in the limited areas where the Allocated Territory of two Defendant Insurance Companies overlap, all other Defendant Insurance Companies are prohibited from quoting employers or plans for insurance or ASO services headquartered in those areas.  These agreements, achieved through the use of BCBSA license agreements and the Rules of the BCBSA, are customer or territorial allocations among actual or potential horizontal competitors that are intended to prevent, and do in fact prevent, Defendant Insurance Companies from

competing against each other by bidding for a National Account headquartered outside of their Allocated Territory, including with respect to the ASO contracts.

159.   This elimination of competition has and continues to injure Plaintiffs by causing them to overpay for ASO insurance services.  Each time a Plaintiff has sought bids for or sought to negotiate, renegotiate or undertake a competitive market check of its ASO service contract (which they have all done during the relevant period), the Defendant Insurance Companies have individually and jointly refused to meaningfully compete for those contracts.  Defendant Insurance Companies routinely confirm their customer allocation agreement by continuing to participate in the BCBSA and adhering to and enforcing the BCBSA rules.  Their illegal conduct has damaged and continues to damage Plaintiffs (and other National Accounts) with regard to every RFP, negotiation, and/or market review process.

160.   Each of the Defendant Insurance Companies is an independent economic actor. Defendant Insurance Companies do not have common shareholders or ownership.  Each has its own sales, revenue and costs and makes its own profits and losses, which redound only to the benefits of its shareholders or stakeholders. Each Defendant Insurance Company is an actual or potential competitor of every other Defendant Insurance Company, as they all sell similar products and services and, but for the illegal acts alleged herein, could and would enter into each other's Allocated Territory and compete against each other for the business of the accounts headquartered therein, including the Plaintiffs' accounts.  As actual or potential

competitors, each with its own profits and losses, the Defendant Insurance Companies would, in the absence of the anticompetitive agreements alleged herein, each have an economic incentive to, and would, act as an independent center of economic decision-making and compete against the other Defendant Insurance Companies so as to increase its own sales and profits by out-competing the other Defendant Insurance Companies for customers and business.  The anticompetitive agreements alleged herein deprive the relevant market of the independent and competitive centers of decision-making that are necessary to full and free competition.

161.   Many of the Defendant Insurance Companies have developed (or could develop) substantial non-Blue brands ("Green Competition") that could compete with the Blue-branded products offered by Defendant Insurance Companies. However, BCBSA rules limit the output of Green Competition and restrict the ability of individual Defendant Insurance Companies to compete both outside and inside of their Allocated Territory under non-Blue brands (*i.e.*, the National Best Efforts Rule and the Local Best Efforts Rule).  But for the illegal agreements to restrict output and allocate customers, the Defendant Insurance Companies could and would use their Blue brands and non-Blue brands to compete with each other for the business of the Plaintiffs, which would result in greater competition and reduce prices paid by the Plaintiffs for ASO insurance services.

162.   For example, as measured by total enrollment, Anthem is the largest health insurer in the United States with approximately 38.5 million enrollees. Anthem has been allocated the geographic areas of all or part of 14 states, and also offers "green" insurance throughout the U.S. through its non-Blue subsidiary, UniCare.   Anthem also operates in a number of states outside of its Allocated Territory through its Medicaid subsidiary, Amerigroup. Since Anthem is already operating outside of its Allocated Territory via UniCare and Amerigroup, Anthem could compete for National Accounts outside of its Allocated Territory but for the illegal territorial restrictions and output limitations alleged herein.   Indeed, Anthem acquired UniCare (through a merger with WellPoint) in 2004 to compete as a non-Blue brand.   However, in 2006, Anthem froze UniCare expansion at the behest of and in agreement with the other Defendant Co-Conspirators and by 2008 was considering selling UniCare to "[e]liminate[] source of friction with other Blues."

163.   Health Care Service Corporation likewise operates in many states.   It has been allotted the exclusive territories of Illinois, New Mexico, Oklahoma, Texas, and Montana, and it is the largest mutual health insurance company and the fourth largest health insurance company in the United States.   It, too, could and would compete for National Accounts outside of its Allocated Territory, but for the illegal territorial restraints and output restrictions alleged herein.

164.   Defendant Insurance Companies have a history of competing against each other in the few areas where such competition is not barred by the illegal horizontal agreements alleged herein.

165.   The Antitrust Division of the Department of Justice defines a *per se* illegal allocation scheme as follows: "allocation schemes are agreements in which competitors divide markets among themselves.  In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves.  For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers.  In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."

166.   By creating and enforcing the allocation of National Accounts and the other anti-competitive rules and agreements of the BCBSA, including the restrictive provisions of their respective license agreements with the BCBSA, Defendants have entered into *per se* illegal agreements in the sale of commercial health insurance to National Accounts in the United States.

167.   Defendant Insurance Companies exercise market power in the relevant market for insurance services provided to National Accounts.  As of September 2015, Defendant Insurance Companies served 85% of the Fortune 100 companies

and 76% of Fortune 500 companies, a key indication of the market share and market power the Defendant Insurance Companies have in the relevant market for National Accounts.[4]  Collectively, the Defendant Insurance Companies control significantly more than 50% of the relevant market.  Furthermore, the Defendant Insurance Companies have the ability – which they have exercised – to raise price significantly above the competitive level without losing so many sales as to make the price increase unprofitable.

168.   The elasticity of demand and cross-elasticity of demand is very low in the National Account market.  Large employers that provide health benefits to their employees have little choice other than to provide such benefits.  Accordingly, a small but significant non-transitory increase in the price of insurance services will not cause National Accounts to stop purchasing such services or switch to a close substitute.

169.   National Accounts have fewer insurance choices than other ASO plans, small employers, or individual insureds because only Defendant Insurance Companies along with United, Cigna and Aetna can service the vast majority of National Accounts.  Third Party Administrators ("TPAs") are not viable competitors for National Accounts and have at most a 1% presence in the National Account

---

[4] Mark Farrah Associates, *Blue Cross and Blue Shield Market Share Snapshot 2015*, Healthcare Business Strategy (Jan. 26, 2016), https://www.markfarrah.com/uploaded/mfa-briefs/Blue-Cross-and-Blue-Shield-Market-Share-Snapshot-2015.pdf (last accessed August 26, 2021).

market.  Defendant Insurance Companies enjoy a market share of 2 ½ to 3 times the share of any other competitor in the National Account market and, as alleged above, in excess of 50% of the relevant market.

170.   Indeed, in litigation involving a prospective merger between Anthem and Cigna, the district court held that the merger was anticompetitive and illegal due to the market share and market power of Anthem in the National Account market, alone.  To this end, the court held that if Anthem were to increase its share of the market for National Accounts within Anthem's fourteen-state Allocated Territory from 40% to 48% the merger would presumably lessen competition because the market would be too concentrated.  Specifically, a market share increase from 40% to 48% would lead to a Herfindahl-Hirschmann Index ("HHI") concentration increase of 641 to 3124, a number well above the HHI of 2500 used as a baseline to determine a highly concentrated market.  *Anthem*, 236 F. Supp. 3d at 209.  The court held that the proposed merger was anticompetitive and illegal and rejected it.  *Id*. at 259.

171.  If reducing the number of competitors from 4 to 3 in the Anthem Allocated Territory was sufficient to make the Anthem/Cigna merger anticompetitive, then restricting competition among all the Defendant Insurance Companies so as to effectively reduce the number of competitors for National Accounts from 37 to only 4 likewise increases market power and allows for its

anticompetitive abuse.  Knowing that other competitors cannot participate in the bidding for a National Account causes all the others to bid less aggressively.

172.   If the market allocation and/or output restrictions were eliminated, Defendant Insurance Companies would also compete to a greater extent for National Accounts in the relevant market.  This would effectively deconcentrate the relevant market as the Defendant Insurance Companies would exercise their newfound ability to bid on National Accounts in the Allocated Territory of other Defendant Insurance Companies.  This would cause prices to drop and the market for National Accounts to become much more competitive as would be reflected in a significantly reduced HHI score.  This would also improve quality by allowing National Accounts to seek out those Defendant Insurance Companies with superior services.

173.   The Defendant Insurance Companies collectively use their market power to achieve anticompetitive results in the relevant market for National Accounts as is demonstrated by their ability to limit consumer choice, raise prices above the competitive level, and impose onerous terms on National Account purchasers, all without losing market share.

174.   At a minimum, Defendant Insurance Companies have exercised their collective market power in the relevant market for National Accounts to maintain that market power over National Accounts even as their illegal and anticompetitive horizontal restraints limit output and restrict the choice of Plaintiffs to just one of the Defendant Insurance Companies in each Allocated Territory.

50

175. The Defendant Insurance Companies have, at a minimum, profitably instituted a small but significant and non-transitory increase in the price the Defendant Insurance Companies charge for health insurance services to National Accounts without losing collective market share or causing their companies to be less profitable.

176. The Defendant Insurance Companies' market power is also demonstrated by their imposition of commercially unreasonable contractual terms and conditions on Plaintiffs who contract for their services, which would not be agreed to by such Plaintiffs but for the absence of competition created by the Blues' exercise of market power.

## V.  HISTORY OF THE DEFENDANT INSURANCE COMPANIES AND BCBSA

177. The history of Blue Cross and Blue Shield demonstrates that the Defendant Insurance Companies arose independently and generically and used various Blue Cross and Blue Shield marks without the need for allocating the market or restricting output. Only after years of consolidation and a desire to avoid competition amongst themselves did Defendant Insurance Companies and various predecessors conceive of coordinating the use of Blue Cross and Blue Shield marks in an effort to reduce competition with one another through geographic and customer allocations and other output restrictions.

178.   BCBSA was created by the Defendant Insurance Companies; is entirely owned and controlled by them; and is the vehicle through which the Defendant Insurance Companies have combined and conspired in illegal restraint of competition.   Moreover, the history of BCBSA demonstrates that the territorial and customer allocations in its purported trademark licenses facilitated a common plan to eliminate competition between the various Defendant Insurance Companies.

## A.   <u>Development of the Blue Cross Companies</u>

179.   In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota.   In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand for a health care plan.   Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.   The St. Paul plan did not try to prevent other plans from using the Blue Cross symbol or to monitor the quality of the services offered by other plans.   To the contrary, the St. Paul plan acquiesced in and even encouraged other plans to use the Blue Cross symbol even if those plans were in geographic areas that the St. Paul plan could reasonably expand.   The St. Paul plan allowed other

competing hospital plans to use the Blue Cross symbol in every bordering state (i.e. North Dakota, South Dakota, Wisconsin, and Iowa) without objection.

180.   In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  In 1938, the AHA's Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

181.   In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

182.   In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: approval would be denied to any plan operating in another plan's service area.  Despite this, the independently formed prepaid hospital plans, now using the generic Blue Cross name, engaged in fierce competition with each other and often entered each other's territories regardless of the new standard.

183.   In 1947 and 1948 the AHA applied for and received a federal registration for the Blue Cross marks.  The AHA did this without procuring an assignment from the first user – the St. Paul Plan.

**B.      Development of the Blue Shield Plans**

184.    The development of what became the Blue Shield plans followed, and it largely imitated the development of the plans using the Blue Cross mark.  Blue Shield plans were designed to provide a mechanism for covering the cost of physician care – just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  Similar to the development of the Blue Cross hospital plans in conjunction with the AHA (which represents hospitals), the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

185.    Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and it proliferated as other plans adopted it without the need for or obtaining any license.  The first use of the Blue Shield Service Mark was by the Western New York Plan in Buffalo, New York in 1939.  The Buffalo plan did not attempt to exclude other plans from using the Blue Shield service mark.  To the contrary, the Buffalo plan acquiesced in the use of the mark by other plans and even encouraged other plans to use the Blue Shield mark; and, from 1939 to 1947, the Blue Shield marks were used by various medical plans.

186. In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent plans that had been using the Blue Shield mark.  In 1947, the successor to the AMCP, the Blue Shield Medical Care Plans (the "National Organization"), formally adopted

54

the Blue Shield mark as the mark of the association.   In 1950, the National

Organization applied for federal registration of the Blue Shield mark.   In 1960, the

AMCP changed its name to the National Association of Blue Shield Plans, which in

1976 changed its name to the Blue Shield Association.

### C.   The Rise of Self-Funded Insurance

187.   In 1933, the New York state insurance commissioner determined that

the early plans using the Blue Cross mark should be viewed as insurance because

the plans collected premiums in advance and promised to provide care at some future

date, not unlike life or casualty insurance.  *See* "History of Health Insurance in the

United States," in Michael A. Morrissey, *Health Insurance, Second Edition* (2013),

at 7 (hereinafter "Morrissey").

188.   Beginning in the 1940s, employers in the United States began to offer

health insurance to their employees as a way of compensating employees at a time

of wage and price controls during World War II.   Morrissey at 11.   The expansion

of labor unions and favorable federal tax treatment further drove the growth of

employer-sponsored health plans following the war.  *Id.* at 12-13.

189.   Originally, most employers purchased comprehensive commercial

health insurance from healthcare insurance companies, such as Defendant Insurance

Companies, but that changed after the passage of the Employee Retirement Income

Security Act ("ERISA") in 1974.  Under ERISA, self-insured plans were not subject

to state insurance regulations dealing with reserves or coverage requirements or to state premium taxes.  Morrissey at 16.

190.   ERISA had a profound impact on commercial health insurance plans purchased by large employers such that by 2011, 57 percent of insured workers were in a self-insured plan.

### D.   Creation of the Blue Cross and Blue Shield Association

191.   Historically, the insurance companies using the Blue Cross and Blue Shield marks were fierce competitors.

192.   During the early decades of their existence, there were no restrictions on the ability of a plan using the Blue Cross or Blue Shield marks to compete with or offer coverage in an area already covered by another plan.  "Cross-on-Cross" and "Shield-on-Shield" competition also flourished.

193.   By the late 1940s, health insurance companies using a Blue mark faced growing competition not just from each other, but also from other insurance companies that had entered the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million.  While the insurance companies using the Blue marks remained dominant in most markets, this growth of competition was considered a threat.

194.   From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all plans using a Blue mark to be called

the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that an unlawful restraint of trade action might result from such coordination.

195.  To counter the increasing competition, the Defendant Insurance Companies agreed to centralize the purported ownership of Blue marks that they had all used and which had become generic by that time.  In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."  Of course, attempting to revive or register a mark for the purposes of violating Federal antitrust law invalidates the mark.

196.  In 1954, the insurance companies using Blue Cross marks agreed to transfer any purported rights that they might have in each of the respective trade names and trademarks to the AHA.  Yet, in many areas in the country, no Defendant Insurance Company ever owned exclusive common law rights that could be transferred to anyone.  In 1972, the AHA assigned its purported rights in these marks to the Blue Cross Association.  These assignments were contrary to public policy and done in furtherance of Defendants' conspiracy to violate the antitrust laws.

197.  Likewise, in 1952, the insurance companies using Blue Shield marks agreed to transfer any rights that they purported to have in the trade names and trademarks that they had all used and that had become generic by the time to the

National Association of Blue Shield Plans, which in 1976 was renamed the Blue Shield Association.  As with the Blue Cross marks, in many areas in the country, no Defendant Insurance Company had ever owned exclusive common law rights that could be transferred to anyone.

198.   During the 1970s, Defendant Insurance Companies began merging with their competitors, including other BCBS companies, all over the U.S.  By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.   In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (which was then called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

199.   In his annual report to the associations given in 1979, President Walter J. McNerney called for further "coordinated action."[5]

200.   This "coordinated action" raised antitrust concerns.  In 1980, when the two associations were considering a joint National Government Market Strategy, it was noted that "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust aspects of what is being proposed, as well as the manner in which it is being considered."

---

[5] *See* Defendant Blue Cross Blue Shield Association's Answer to the Subscriber Track's Third Amended Consol. Class Action Complaint ¶ 487, p. 176, *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. May 17, 2017), ECF No. 1166.

201.   In 1982, the Blue Cross Association and the Blue Shield Association merged to form the Defendant, BCBSA.  At that time, BCBSA became the sole owner of the putative Blue Cross and Blue Shield trademarks and trade names that purportedly had previously been transferred by Defendant Insurance Companies and their predecessor-competitors with whom they had merged or acquired.

202.   In November 1982, after heated debate, BCBSA's member plans agreed to and promulgated two BCBSA "propositions" (Proposition Nos. 1.1 and 1.2): (1.1) by the end of 1984, all existing insurance companies using a Blue mark would consolidate at a local level to form Blue Cross and Blue Shield plans; and (1.2) by the end of 1985, all insurance companies using a Blue mark within a state would further consolidate, ensuring that each state would have only one BCBS competitor.  Proposition 1.2 was justified as "a concentration of power and resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively," including "decision-making" and "policy determination."   As a result of these propositions, the number of insurance companies using the Blue mark declined sharply from 114 in 1980, to 77 in 1990, and now less than half that amount.

203.   Even consolidation, however, did not end all competition between the coordinating insurance companies.

204.   In the early 1980s, for example, multiple insurance companies using Blue marks competed head-to-head in parts of New York.

205.   From 1981 to 1986, the Defendant Insurance Companies lost market share of the market for the sale of healthcare insurance (both individual and group) to other healthcare insurance carriers (including other Defendant Insurance Companies competing under their non-Blue brands) at a rate of approximately one percent per year.  At the same time, the amount of competition among Defendant Insurance Companies, including their subsidiaries operating without a Blue mark, increased substantially.

206.   In order to provide "checks and balances" against "open competition," the members of the Blue conspiracy presented at the 1982 annual meeting a "Long-Term Business Strategy."   At this meeting, the co-conspirators adopted several recommendations contained in the Long-Term Business Strategy, including Proposition 1.2, described above, which provided that there would be only one co-conspirator per state.

207.   As a result, the number of insurance companies offering Blue-branded products has decreased from 114 in 1980, to 77 in 1990, and today, stands at less than half that amount.

208.   In April 1987, the member plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other.   During these meetings, these independent economic actors/health insurers and competitors agreed to recognize

and maintain exclusive Allocated Territories when using the Blue brand, thereby eliminating "Blue on Blue" competition.

209.   However, the 1987 Assembly of Plans did not restrain competition by non-Blue branded plans of Defendant Insurance Companies – an increasing "problem" that caused complaints from many Defendant Insurance Companies.

210.   After the 1986 revocation of the Defendant Insurance Companies' tax-exempt status and throughout the 1990s, the number of non-Blue branded plans of Defendant Insurance Companies increased.

211.   These plans continued to compete with Blue-branded plans.

212.   As a result, the member/owners of BCBSA discussed ways to rein in the non-Blue branded output and resulting competition that was thwarting their market allocation scheme.

213.   In 1996 after recommendations by a Special Committee of the BCBSA, the Defendant Insurance Companies voted to modify the BCBSA rules to which the BCBSA's members were subject by inserting a local "best efforts" requirement into the service mark licensing agreement that every Defendant Insurance Company entered into with the BCBSA.   The new requirement agreed to by all of the Defendant Insurance Companies reads as follows: "[a]t least 80% of the annual Combined Local Net Revenue of a controlled affiliate attributable to health care plans and related services ... offered within the designated Service Area must be sold, marketed, administered or underwritten under the Licensed Marks and Names."

214.   The Defendant Insurance Companies also adopted and agreed to a restraint that required any Defendant Insurance Company that departed from BCBSA to pay an exit fee.

215.   They also limited transfer rights by requiring prior BCBSA review and facilitation of the establishment of a successor Blue Licensee.

216.   Defendant Insurance Companies then turned their attention to a national "best efforts" requirement. A 51% national best efforts proposal, requiring that 51% of a Defendant Insurance Company's revenues come from the sale of Blue-branded services, was voted down in 2001.  But an even more restrictive rule was proposed and presented in 2004 and later accepted and agreed to by the Defendant Insurance Companies and the BCBSA.  This National Best Efforts Rule is embodied in the following unlawful rule: "[a]t least 66-2/3% of the annual Combined National Net Revenue of the Controlled Affiliate[] attributable to health care plans and related services … must be sold, marketed, administered or underwritten under the Licensed Marks and Names.  The percentage set forth in this paragraph shall not be changed for at least 10 years from the date of adoption of this paragraph."  After these ten years expired (and during the relevant time period), the Defendant Insurance Companies agreed that the National Best Efforts Rule would be continued.

217.   The Defendant Insurance Companies and the BCBSA also enacted and agreed to anticompetitive restraints regarding the allocation of National Accounts amongst Defendant Insurance Companies.  In a further effort to monetize their

unlawful customer allocation, Defendant Insurance Companies agreed through the BCBSA that they could sell their exclusive territorial rights to provide services to purchasers headquartered in their allocated territory through a process known as ceding, whereby one Defendant Insurance Company can sell to another Defendant Insurance Company the right to contact, sell to, and service the members of a National Account headquartered in its Allocated Territory for a price.  A Defendant Insurance Company could sell a National Account to one and only one other Defendant Insurance Company the exclusive right to bid on the account, thereby ensuring that any National Account within any particular Defendant Insurance Company's Allocated Territory would have no more than one Defendant Insurance Company bid for its business.

218.   The Defendant Insurance Companies did not need these restraints to service National Accounts. The Defendant Insurance Companies could have serviced National Accounts without conspiring to restrict competition and limit output.  In fact, prior to 2005, when the National Best Efforts Rule was adopted by the BCBSA, the Defendant Insurance Companies did provide insurance services to National Accounts without the (anticompetitive) use of the National Best Efforts Rule.

219.  The fact of ceding – whereby a Defendant Insurance Company essentially sells its right to bid on a National Account within its Allocated Territory

to another Defendant Insurance Company – demonstrates that the restraints are not necessary to service National Accounts.

220.   The restraints are not ancillary to any pro-competitive agreement among the Defendant Insurance Companies and are unnecessary to effectuate any pro-competitive purposes.

221.   Allocated Territories and customers are not necessary to serve National Accounts and any such purported necessity provides no justification for the allocation of National Account customers.  When an Insurance Company Defendant services a National Account, it is already operating *outside* of its Allocated Territory.

222.   Defendant Co-Conspirators use the Allocated Territories as a means to implement their customer allocation by dividing up National Accounts based upon the Allocated Territory in which the account is headquartered.  Yet, Defendants Co-Conspirators could just as easily—and unlawfully—allocate them based on where a National Account has the most covered lives or where it is incorporated.  Likewise, Defendant Co-Conspirators could achieve their same (unlawful) objective by allocating national accounts alphabetically or by random draw.  There is nothing inherent about Defendants' allocation of National Accounts that requires the

Allocated Territories nor does the continuation of the Allocated Areas require the allocation of National Accounts.[6]

223.   In this respect, Plaintiffs' complaint about unlawful market allocation is not about the continuation of the Allocated Territories.  Rather, it is about an agreement among the Defendant Insurance Companies to limit which one of them can offer services to a National Account.

## VI.   CONTROL OF BCBSA BY DEFENDANT INSURANCE COMPANIES

224.   On its website, BCBSA calls itself "a national association of 36 independent, community-based and locally operated Blue Cross and Blue Shield companies."  It "grants licenses to independent companies to use the trademarks and names in exclusive geographic areas."  The trademarks and trade names are the Blue Cross and Blue Shield trademarks, trade names and logos.

225.   The Defendant Insurance Companies are the members and owners of BCBSA and collectively control and govern every aspect of BCBSA, including its rules and the terms of the license agreements that the association enters into with its members.  Each of the Defendant Insurance Companies agrees with each other and

---

[6]      For this reason, if Defendants' geographic allocation is illegal, then so too is the National Account allocation.  But if the Allocated Territories are deemed lawful or subject to a standard other than *per se* analysis, then it does not follow that the National Account allocation is lawful or subject to any standard other than *per se*.

with the BCBSA to adhere to the rules, regulations, and bylaws promulgated by the jointly owned and controlled association.

226.   The Defendant Insurance Companies are all independent health insurance companies that could and would compete with one another in the absence of the unlawful agreements alleged herein.   In order to prevent such competition, Defendant Insurance Companies utilize the collective control they purport to have over certain Blue marks and names that they then license to the Defendant Insurance Companies on terms that the Defendants collectively agree upon.   The BCBSA is not a single entity but is instead a combination or conspiracy of the Defendant Insurance Companies.   The BCBSA's Board of Directors is comprised of one member from each of the Defendant Insurance Companies, plus the CEO of BCBSA.

227.   As one federal court has recognized, BCBSA "is owned and controlled by the member plans."   *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).   Accordingly, BCBSA lacks the characteristics of a single entity and operates as a cartel of competitors, which is what BCBSA is in fact.

228.   The MDL Court has held that the undisputed evidence shows that "the Blue Plans are 36 independent companies," each of which sells health insurance services; that each plan is "autonomous in its operations" and a "financially independent entit[y]" with its own profits and losses; and that Defendant Co-Conspirators are not "partners or joint ventures."   308 F. Supp. 3d at 1250.   In other

words, each Defendant is a separate economic actor pursuing separate economic interests.

229.   The Rules of the BCBSA are determined by a three-quarters weighted vote of its members and "each member Plan has agreed to be bound by the Association Rules." *Id*.  The MDL Court found that "the undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement" and that the Defendant Insurance Companies "vote on and approve amendments to the licensing agreements." *Id*. at 1267.  The MDL Court further found that each Defendant Insurance Company has entered into a license agreement with the collectively controlled BCBSA. *Id*. at 1251.  In each of those license agreements the BCBSA grants to each Defendant Insurance Company "an exclusive 'service area' where a Member Plan may use the Blue Marks" and, critically, each member is required to agree with collectively controlled and owned BCBSA that "it may not use the licensed Marks and Name outside the service area." *Id*.

230.   The determination of where an individual Defendant Insurance Company will compete using a Blue mark and in what areas it will refrain from competing is not left to the "independent decision-making" of each licensee or to the independent decision-making of a holder of common-law trademark rights.  To the contrary, it is the BCBSA that is composed of 36 separate economic entities, each with its own interest in preventing other members from directly competing with it, that formulated the rules that govern where and with whom each Defendant

Insurance Company can compete.  Clearly, each Defendant Insurance Company is a separate economic actor with their own economic interests to pursue who, by joining together with the BCBSA collective to decide how and where the licensees will compete, have deprived the marketplace of the independent centers of decision-making that competition requires.  As a result, Defendant Co-Conspirators do not, as a matter of law, qualify for single-entity treatment.

231.   The Government Accountability Office ("GAO") issued a detailed report on the operations of BCBSA in 1994 that was prepared with the cooperation of the association.[7]   The GAO's report described the governance structure of BCBSA as follows:

> As members of the Association, Blues plans collectively govern the Association's affairs pursuant to written bylaws. Under these bylaws, the Association is governed by a board of directors.  The board of directors consists of the CEOs of most plans and the Association president.  Plan representatives to the membership meetings may or may not be the plan CEO.  For practical purposes, meetings of the Association's board of directors and its membership comprise largely the same individuals.[8]

232.   Thus, the Defendant Insurance Companies control the Board of Directors of BCBSA.

---

[7]      Government Accountability Office, "Blue Cross and Blue Shield: Experiences of Weak Plans Underscore the Role of Effective State Oversight," Apr. 1994 ("GAO Report"), at 24, available at http://archive.gao.gov/t2pbat3/151562.pdf.

[8]      *Id.* at 24-25.

233.   In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."

234.   The current chairman of the Board of Directors, Tim Vines, is also the president and chief executive officer of Blue Cross and Blue Shield of Alabama. Mr. Vines assumed leadership in November 2021, from David L. Holmberg, who previously served as chair of the Board while also serving as the President and CEO of defendant Highmark Health, which describes itself as:

> an $18 billion blended health organization that includes one of America's largest Blue Cross Blue Shield insurers and a growing regional hospital and physician network. Based in Pittsburgh, PA, Highmark Health's 35,000 employees serve millions of customers nationwide through the nonprofit organization's affiliated businesses, including Highmark Inc., Allegheny Health Network, HM Insurance Group, United Concordia Dental, and Helion.

235.   The Board of Directors of BCBSA meets at least quarterly.

236.   The Board of Directors – comprised of Defendant Insurance Company executives – possess the authority to amend or add rules, regulations, bylaws, and restraints on competition.

237.   The governance structure of the Association is set out in its bylaws, which were approved by a vote of the Defendant Insurance Companies.

238.   Defendant Insurance Companies may amend or repeal the bylaws and adopt new bylaws.  Likewise, they may revoke and return at any time the purported ownership of any marks or trade names registered to BCBSA.

239.   The GAO Report also described the voting process used by the

BCBSA:

> Decisions on significant issues relevant to all plans are generally decided by a vote of the Association membership.   Examples of significant issues include the termination of a plan's membership license or the amendment of the Association's bylaws.   The membership voting process combines a straight vote – one member, one vote – and a weighted vote.   Under weighted voting, each member plan is entitled to one vote for each $1,000 of annual dues it pays to the Association.   Because dues are based on plan premium volume, the larger plans receive a greater number of weighted votes than smaller plans.
>
> For a membership vote to pass, the bylaws generally require a majority of both the straight and weighted votes of the members.   However, this rule has exceptions. For example, the termination of a plan's trademark license requires at least three-fourths of the straight vote and three-fourths of the weighted vote rather than a simple majority.   An amendment to the Association bylaws, on the other hand, requires one-half of the straight vote and two-thirds of the weighted vote.[9]

## VII.   LICENSE   AGREEMENTS   AND   RESTRAINTS   ON   COMPETITION

240.   As described above, BCBSA requires each of Defendant Insurance

Company to execute a purported license agreement with respect to its use of Blue

service marks or trade names.

241.   The GAO Report says that:

> To use the Blue Cross and Blue Shield names and trademarks, each Blues plan must sign a license agreement with the Association.   The agreement does not constitute a partnership or joint venture, and the Association has no obligations for the debts of member plans.

---

[9]      *Id.* at 25-26.

> The license agreement restricts plans from using the trademark outside their prescribed service area to prevent competition among plans using the Blue Cross and Blue Shield names and trademarks.[10]

The "prescribed service area" is the "Allocated Territory" described above.

242.   This collective enforcement of trademark "rights" is not the equivalent of individual enforcement of common-law trademark rights.   Common-law trademark rights give the holder the ability to exclude others from using the mark within a given territory.   Defendant Insurance Companies, however, have gone far beyond the grant of that ability to each of them.   Defendant Co-Conspirators collectively through the BCBSA also extract a promise from each other that it will not venture beyond its borders and compete against other Defendant Insurance Companies outside of its territory.   308 F. Supp. 3d at 1269.   Each Defendant Insurance Company even agreed with the group that it could be fined or lose its rights altogether if it tried to break out of its territory and compete against another Defendant.   *Id.*   In other words, Defendant Insurance Companies agreed that each Allocated Territory would not only be an exclusive territory, but also a cage – beyond which the Defendant Insurance Company agreed with all the other Defendants it would not venture.   There are no comparable common-law trademark rights that allow a horizontal group of competitors to agree that none of them will go beyond their territory to compete against each other.   Thus, the BCBSA does not

---

[10]      *Id.* at 28.

merely enforce previously owned individual common-law rights.  It organizes a horizontal group promise that confines each licensee to provide services only to entities that happen to be located in its own territory.

243.  An individual common-law trademark holder can decide on its own to enforce (or not enforce) its common-law trademark rights, but it is precisely the abandonment of that individual decision-making in favor of collective decision-making by a group of competitors that becomes a horizontal agreement among competitors within the meaning of § 1 of the Sherman Act.  Such a horizontal agreement that allocates territories among competitors using the same trademark is a *per se* violation of § 1 of the Sherman Act.

244.  Defendant Insurance Companies as a group through the BCBSA have decided by a 75% weighted vote (1) who will be allowed to use the Blue marks in exclusive territories and (2) that each Defendant must promise not to conduct business by using the BCBS marks and trade names beyond its own Allocated Territory.

245.  If each individual Defendant Insurance Company still had its hypothesized common-law trademark rights, each one of them would independently decide for itself whether to enforce or not enforce those common-law rights.  Just as actually happened, two insurance companies, each with an exclusive Blue territory, could enter each other's Allocated Territory, but each independently decide not to object to the competition or to file suit.  308 F. Supp. 3d at 1253.  Each might be

happy to let the other into its territory so long as it could expand beyond its own borders.  Different Defendant Insurance Companies exercising these purported individual common-law rights could make different independent decisions – some more aggressive, some less so.  Different settlements between them could be struck, or the parties could pursue the dispute to a judicial conclusion and the asserted trademark and trade name rights could be found invalid or not infringed.  All of these events would be determined by separate economic entities, each making its own independent decisions so as to best serve their individual economic interest.  Defendants, however, through their collective control of the BCBSA have eliminated that individual decision-making and replaced it with group decision-making through the BCBSA.  Defendants' conduct is not the codifying of individually owned common-law rights.  It is the transfer of those rights to a collectively controlled horizontal group which eliminates the independent decision-making by competitors that is the essence of market competition.

246.  The Defendant Insurance Companies impose the above-referenced restraints and regulations on one another and agree to obey them.  They control the entry of new members into BCBS and the terms of each other's License Agreement with BCBSA.  These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the

"Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

247.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  Under the terms of the License Agreements, each Defendant Insurance Company "agrees . . . to comply with the Membership Standards."[11]

248.    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards

---

[11]    *See* Defendant Blue Cross and Blue Shield Association's Answer and Affirmative Defenses to Corrected Consol. Second Amended Provider Complaint at ¶ 156, p. 75, *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406,* No. 2:13-cv-20000-RDP (N.D. Ala. Dec. 22, 2014), ECF No. 289.

and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."[12]

249.   The Defendant Insurance Companies police the compliance of each other with the restraints and regulations of BCBSA.

250.   The Defendant Insurance Companies control and administer the disciplinary process for any Defendant Insurance Company that does not abide by BCBSA's restraints and regulations.

251.   The Defendant Insurance Companies control the termination of each other from BCBSA, including the loss of the putative "license" to use the Blue marks and trade name.

252.   The Defendant Insurance Companies are actual and potential competitors for National Accounts.  They coordinate where and how they compete against each other through the control of BCBSA.  The restraints and regulations imposed "by" the BCBSA on the Defendant Insurance Companies are actually anticompetitive restraints and regulations negotiated by, and agreed to, by and

---

[12]   *See* Defendant Blue Cross and Blue Shield Association's Answer and Affirmative Defenses to Corrected Consol. Second Amended Provider Complaint at ¶ 157, p. 75, *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. Dec. 22, 2014), ECF No. 289.

amongst the Defendant Insurance Companies — all of which are or would be horizontal competitors but for the anticompetitive agreements alleged herein.

253.   The Defendant Insurance Companies include many of the largest health insurance companies in the United States.  By some measures, Defendant Anthem is the largest health insurance company in the nation.  Similarly, 15 of the 25 largest health insurance companies in the country are Defendant Insurance Companies.  On its website, BCBSA states that its members together provide "coverage for nearly 100 million people - one-third of all Americans" and that, nationwide, "more than 96% of hospitals and 91% of professional providers contract with Blue Cross and Blue Shield companies - more than any other insurers."  Absent the restrictions that the Defendant Insurance Companies have agreed to impose on themselves, discussed below, these companies would compete against each other in the market for National Accounts (and potentially other markets as well).

254.  As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into horizontal agreements that restrain competition.

255.   Because BCBSA is owned and controlled by the Defendant Insurance Companies, any agreement between BCBSA and a Defendant Insurance Company constitutes a horizontal agreement between and among the Defendant Insurance Companies themselves.   As two economists told the FTC, "[t]he Blues collude almost perfectly.  Blue Cross and Blue Shield plans agree upon geographical market

areas with the assistance of their national associations."[13]   This collusion later became even more pernicious with the advent of Allocated Territories and the "best efforts" requirements outlined above.   As one legal scholar (Mark Hal of Wake Forest Law School) noted recently when referring to the structure of BCBSA and the various restraints at issue here, "[i]t's sort of antitrust law 101 that direct competitors can't agree to divvy up their territory."[14]

## VIII.  <u>THE HORIZONTAL AGREEMENTS NOT TO COMPETE</u>

256.   Each Defendant Insurance Company listed herein is an independent legal entity.

257.   No Defendant Insurance Company has or had any franchise agreement with another Defendant Insurance Company.

258.   No Defendant Insurance Company has or had any franchise agreement with BCBSA.

259.   The restraints and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, Rules, Bylaws, and the

---

[13]     Federal Trade Commission, "Competition in the Health Care Sector: Past, Present, and Future," Mar. 1978, at 212, at
https://www.ftc.gov/sites/default/files/documents/reports/competition-health-care-sector-past-present-and-future-proceedings-conference/197803healthcare.pdf (last accessed September 3, 2021).

[14]     American Bar Association, "Blue Cross Blue Shield Antitrust Litigation: Update on the Issues," May 4, 2016, at
https://www.americanbar.org/content/dam/aba/publications/antitrust_law/20160504_at160504_materials.authcheckdam.pdf  (last accessed August 28, 2019).

Guidelines, constitute horizontal agreements between competitors, Defendant Insurance Companies, to limit output and divide the geographic market for commercial healthcare insurance in the United States.  As such, they are *per se* violations of § 1 of the Sherman Act.

260.   Defendant Co-Conspirators have divided the National Account market into Allocated Territories assigned exclusively to distinct Defendant Insurance Companies such that only one of them can bid on any particular National Account. Through the License Agreements, Guidelines, and Membership Standards, which the Defendant Insurance Companies created, control, and enforce, each Defendant Insurance Company agrees that neither it nor its subsidiaries will compete under Blue Cross and Blue Shield marks or names outside of a designated Allocated Territory.

261.   The License Agreement defines each Defendant Insurance Company's Allocated Territory as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."  The Association has a "Map Book" which memorializes the Defendant Insurance Companies' defined service areas.  Under the License Agreements, subject to certain exceptions related to National Accounts and Government Programs, Defendant Insurance Companies agreed that a "Plan may not use the Licensed Marks and Name outside the Service Area … ."  These Map Books are not public record.  They are considered

by the Association to be "highly sensitive" and are distributed only to a limited number of employees.

262.   Each Defendant Insurance Company entered into a License Agreement with BCBSA.

263.   All Defendant Co-Conspirators have enforced the Allocated Territories provided by the License Agreement.

264.   The Defendant Insurance Companies have abided by the Allocated Territories and have refused to compete against each other to provide Blue-branded commercial healthcare insurance to National Accounts.

265.   In addition to allocating geographic markets through their use of Allocated Territories, Defendant Co-Conspirators have developed additional rules which place added restraints on the Defendant Insurance Companies' ability to compete, and not only with each other.  The Guidelines and Membership Standards, which Defendant Insurance Companies created, control, and enforce, and with which each must agree to comply as part of the License Agreements, establish two key output restrictions on non-Blue competition, which have been quoted above.

266.   First, in 1994, the Defendant Co-Conspirators adopted what is known as the Local Best Efforts Rule.  Under this rule, each Defendant Insurance Company agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Allocated Territory (excluding Medicare and Medicaid) shall

be derived from services offered under Blue Cross and Blue Shield marks and names.

267.   Second, in 2005, the Defendant Co-Conspirators adopted what is known as the National Best Efforts Rule.  Under this rule, each Defendant Insurance Company agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Allocated Territory (excluding Medicare and Medicaid) shall be attributable to services sold under Blue Cross and Blue Shield marks and names.  The Guidelines provide that national enrollment can be substituted for annual revenue, which constitutes an alternative restriction that a Defendant Insurance Company will derive no less than 66-2/3% of its national enrollment from its Blue-branded business.  The initial term of the National Best Efforts Rule lasted until 2015, at which point the Defendant Insurance Companies decided that they would agree to its continuation.

268.   These provisions place an output restriction on Defendant Insurance Companies' non-Blue business and limit the extent to which Defendant Insurance Companies can compete with other co-conspirator licensees under non-Blue marks (*i.e.* green competition).  These output restrictions directly limit the ability of each Defendant Insurance Company to compete and generate revenue from non-Blue branded (*i.e.* green) business and thereby restrict each company's ability to develop non-Blue brands that could compete with Defendant Insurance Companies or non-Blue plans of the Defendant Insurance Companies and other insurance companies

for National Account business.   These provisions further discourage and disincentivize each Defendant from developing and competing through any non-Blue branded businesses.

269.   The one-third cap on national non-Blue branded revenue reduces to a minimal level the incentive, if any, and the ability of each Defendant Insurance Company to compete outside of its Allocated Territory.   To do so, the Defendant Insurance Company would have to buy, rent, or build a provider network under a non-Blue brand while ensuring that revenue derived from that brand did not exceed the one-third as of its national revenue.   Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making the needed investment.

270.   Each Defendant Insurance Company also agreed that they would not develop a provider network outside of its Allocated Territory.

271.   In sum, each Defendant Insurance Company has agreed with its actual or potential competitors that each of them will exercise the exclusive right to use the Blue brand within a designated geographic area, derive none of its revenue from services offered under the Blue brand outside of that area, and derive at most one-third of its revenue by offering services under a non-Blue brand.   The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.   Together, these restrictions eliminate all Blue-branded competition among Defendant Insurance

Companies for National Accounts and severely limit non-Blue branded (or green) competition between Defendant Insurance Companies for National Accounts.

272.   The foregoing restrictions on the ability of Defendant Insurance Companies to generate revenue outside of their Allocated Territory constitute agreements between competitors to both limit output and allocate geographic markets, and therefore are *per se* violations of § 1 of the Sherman Act.

273.   Each Defendant Insurance Company has abided by the foregoing restrictions on the ability of Defendant Insurance Companies to generate revenue outside of their Allocated Territory during the relevant time period.

274.   The largest Defendant Insurance Company, Anthem, Inc., is a publicly-traded company and has acknowledged the restrictions to which it continues to agree.  In its Form 10-K filed February 20, 2019, Anthem stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products."  Anthem has further stated that the "license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue, as defined by the BCBSA, attributable to health benefit plans within its [Allocated Territory] must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least two-thirds of a licensee's annual combined national net revenue, as defined by the BCBSA,

attributable to care plans and related services sold, marketed, administered or underwritten under the BCBS names and marks[.]"

275.   Likewise, in its Form 10-K filed March 1, 2019, Triple-S Salud, which has been allocated Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Allocated Territory] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Allocated Territory], must be sold, marketed, administered, or underwritten through use of the BCBS" name and mark.  Further, Triple-S Salud stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the BCBS names and marks is already present."

276.   Despite these public admissions, both BCBSA and the Defendant Insurance Companies have otherwise attempted to keep the territorial restrictions as secret as possible.

277.   When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules

on what the plans do in this regard are contained in the license.  However, the license

terms themselves are proprietary to BCBSA, and . . . we would prefer not to share

such trade secrets with BCBSA's competitors."[15]

278.   The Defendant Insurance Companies have agreed amongst themselves

and with the BCBSA to impose harsh penalties on those that violate the territorial

restraints or output restrictions.

279.   According to the Guidelines, a Defendant Insurance Company that

violates one of the territorial restraints could face "[l]icense and membership

termination."   If a Defendant Insurance Company's license and membership are

terminated, it loses the use of the Blue brands.   In addition, in the event of

termination, the Defendant Insurance Company must pay a fee to other Defendant

Insurance Companies through BCBSA.

280.   According to Anthem's February 20, 2019 Form 10-K filing, that "Re-

establishment Fee," which was $98.33 per enrollee through December 31, 2018,

would be used to "fund the establishment of a replacement Blue Cross and/or Blue

Shield licensee in the vacated area [*i.e.* Allocated Territory]" and, were that amount

applied to all of Anthem's enrollees in a Blue branded plan as of December 31, 2018,

Anthem would be assessed more than $3 billion.

---

[15]     *See* Defendant Blue Cross and Blue Shield Association's Answer and Affirmative
Defenses to Subscriber Track Amended Consol. Class Action Complaint at ¶ 360, p. 106, *In re
Blue Cross Blue Shield Antitrust Litigation MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. Dec.
22, 2014), ECF No. 295.

281.   Similarly, in a published opinion, the United States District Court for the District of Columbia found that if Anthem were to fail to comply with the "best efforts" rule and had to pay the re-establishment fee, the cost would be "close to $3 billion." *Anthem* at 259, n.41.

282.   The re-establishment fee is sufficiently large to dissuade Defendant Insurance Companies from violating their collectively-set restraints on competition and facing possible loss of their licenses.

283.   In sum, a terminated Defendant Insurance Company would: (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Defendant Insurance Company in its local area.   These penalties amount to a threat by the BCBSA and Defendant Insurance Companies to put any individual Defendant Insurance Company that breaches the territorial restrictions out of business.

284.   The Defendant Insurance Companies would compete with each other for National Accounts but for the horizontal agreement not to do so.   Historically, Defendant Insurance Companies and their predecessors competed, and to this day some Defendant Insurance Companies compete against each other in certain limited areas that, while protected from much competition, are not exclusively allocated to a single Defendant Insurance Company.

285. Furthermore, while there are numerous Defendant Insurance Companies, and non-Blue competitors owned by such companies, that could and

would compete effectively in each other's Allocated Territory but for the output and territorial restrictions, almost none of the non-Blue (green) competitors compete for National Accounts outside the agreed upon Allocated Territories.

286.   Since entering the License Agreement and absent a ceding agreement or other exception, no Defendant Insurance Company has competed under a Blue mark and/or trade name outside of its designated Allocated Territory.

287.   The Defendant Insurance Companies do not need the Allocated Territories to compete with national insurers.   In the absence of the Allocated Territories, the Defendant Insurance Companies could still utilize the Blue Card program and access to each other's networks to service National Accounts.  In fact, several Defendant Insurance Companies already are some of the largest insurers in the country and otherwise compete with other insurers on a nearly nationwide basis via Medicaid programs.

288.   Furthermore, allowing all Defendant Insurance Companies to bid on National Accounts within the existing Allocated Territories will not undermine the ability of Defendant Insurance Companies to service their local area.  The Defendant Insurance Companies would remain free to focus on their local areas, and the existence of the Allocated Territories as to National Accounts does not enhance efficiency.  The very fact that the Defendant Insurance Companies worked in tandem with BCBSA to merge and operate statewide or broader shows that the Defendant Insurance Companies are not focused and need not be focused on local areas, and

this point is further bolstered by the existence of large, multi-state Defendant Insurance Companies like Anthem and HCSC.

289.   The Defendants do not need the Allocated Territories or the best-efforts restrictions in order to identify the source of any trademarked services or avoid confusion as to the source of any trademarked services among consumers.  To the contrary, there are many significantly less restrictive means to eliminate any potential confusion as to the source of ASO or other services, such as requiring that each Defendant use its actual name to identify the source of the services.

290.   The output and territorial restrictions for National Accounts agreed to by all Defendant Insurance Companies operate so as to restrain competition among the Defendant Insurance Companies with each other.   These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from multiple Defendant Insurance Companies being able to bid for National Accounts and no matter how much premiums and other costs would be reduced if competition were permitted.  The result is that the Plaintiffs and other National Accounts have paid the Defendant Insurance Companies supracompetitive prices to purchase insurance services that have significantly exceeded the price they would have paid but for the unlawful conduct alleged herein.

## IX.   <u>THE BCBSA LICENSE AGREEMENTS HAVE INJURED COMPETITION FOR NATIONAL ACCOUNTS THROUGHOUT THE UNITED STATES</u>

291.   The individual Defendant Insurance Companies, as licensees, members, and parts of the governing body of BCBSA, have conspired with each other (the member plans of BCBSA) and with BCBSA to create, approve, abide by, and enforce the restraints and regulations of BCBSA, including the *per se* illegal territorial and output restrictions in the License Agreements and Guidelines.

292.   But for these illegal agreements, many of the individual Defendant Insurance Companies would otherwise be significant competitors of each other for National Accounts throughout the United States, thereby increasing output.   As alleged above, 15 of the 25 largest health insurance companies in the country are Defendant Insurance Companies: if all of these companies, together with all other Defendant Insurance Companies, were able to compete with each other, the result would be significantly lower prices for National Account ASO plans and thus lower costs paid by Plaintiffs.

293.   During the relevant time period, Defendant Insurance Companies' illegal anticompetitive conduct has restrained competition for National Accounts and significantly increased price by depriving National Accounts of competition in the relevant market from one or more additional individual Defendant Insurance Companies at lower prices set by a competitive market that is free from the restraints imposed by the Defendants on the market.

294.   The Defendant Co-Conspirators themselves, in internal documents, have recognized the anticompetitive nature of their illegal conduct.  For example, in

a summary of conversations with four Blue CEOs from 1986, it is stated that "the major advantage" of Allocated Territories was "in the lessening of competition." Further, a Defendant Insurance Company CEO stated, "[Blues] benefit from the exclusive service areas because it eliminates competition from other Blue Plans," and that without the exclusive service areas, "there would be open warfare."

295.   The illegal anticompetitive conduct of the Defendant Insurance Companies has also led to immense financial windfalls for the Defendant Insurance Companies and their executives.  During the 1980s and afterwards, the Defendant Insurance Companies began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

296.   In 1992, BCBSA ceased requiring Defendant Insurance Companies to be not-for-profit entities.   As a result, many Defendant Insurance Companies converted to for-profit status, leading to companies such as Anthem to become the largest health insurance company in the country as measured by enrollment.

297.   While nominally still characterized as not-for-profit, a number of the individual Defendant Insurance Companies generate substantial earnings and surpluses, and they pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

298.   For example, in its latest report on the topic, issued in June 2015, the Consumers Union of Consumer Reports found that nine non-profit Defendant

Insurance Companies held excess reserves of over $12 billion at the end of 2014. *See* Dena Mendelsohn, *How Much is Too Much: Nonprofit Insurer Surplus After the ACA*, CR Consumer Reports (June 16, 2015), https://advocacy.consumerreports.org/research/how-much-is-too-much-nonprofit-insurer-surplus-after-the-aca/ (last accessed September 3, 2021).

299.   As an example of excessive executive compensation, in 2018, HCSC paid its CEO Paula Steiner $14 million and, that same year, paid its former CEO Patricia Hemingway Hall $3 million, down from $18 million it paid Hall in 2016. HCSC also paid its board members and COO large sums. *See* Stephanie Goldberg, *Blue Cross bosses rake in the green*, Crain's Chicago Business (Oct. 11, 2019), available at https://www.chicagobusiness.com/health-care/blue-cross-bosses-rake-green.

## X.   **DEFENDANTS' CONDUCT HAS NO PROCOMPETITIVE JUSTIFICATIONS**

300.   Whatever encouragement that the Allocated Territories provided individual Defendant Insurance Companies to promote the Blue brand within their Allocated Territories has no relationship to the scheme whereby a single Defendant Insurance Company is allocated the exclusive right to bid on a National Account with employees *outside* of that Defendant Insurance Company's Allocated Territory.

301.   The Allocated Territories could exist without allocating the National Accounts.

302.   Likewise, the allocation of National Accounts is not needed to protect the Blue marks or enable productive cooperation, but instead is employed to reduce horizontal competition.   As Defendant Insurance Companies themselves have admitted:

- "One CEO reported that 'Plans benefit from the exclusive services areas because it eliminates competition from other Blue Plans and that without service areas there would be open warfare.'"  308 F. Supp. 3d at 253.

- "A summary of conversations with four Blue CEOs states 'the major advantage of an exclusive franchise area was seen in the lessening of competition….'"  *Id.*

- "Plan CEOs stated that ESAs create larger market share because other Blues stay out and do not fragment the market."  *Id.*

- Defendants admit that their market allocation scheme is not necessary to protect the Blue Marks:   "Unique issues arising in overlapping service areas can be addressed by reasonable interpretations of the BCBSA rules and regulations, which preserve the integrity of the Brands yet allow Plans to coexist in overlapping service areas."  MDL ECF 1436-100 at 8; MDL ECF 1436-77.

- The BCBSA VP of Consumer Strategy stated that "Brands are not protected by the ESAs but the ESAs protect the Plans' business model…."  MDL ECF 1436-82.

- Defendants admit that the effect of their market allocation is to suppress competition and that without it "Plans would not be able to protect themselves from out of area [Blue] competition" (MDL ECF 14436-13 at  BCBSF-00181534); and that  "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans." MDL ECF 1436-19 at BDCBSA 00083738.

303.   Similarly, the MDL Court found that the market allocation scheme does

not further any new or unique product offering:

> Defendants cannot claim they produce a unique product.  The market allocations at issue are not necessary to market, sell or produce health insurance…. The plan to go to ESAs constituted a new marketing/sales strategy, not a new product.  The products remain exactly the same – commercial insurance and insurance services.

308 F. Supp. 3d at 1269-70.

304.   The allocation of National Accounts does not facilitate interbrand competition.  Although Defendant Insurance Companies sometime utilize common trademarks, each is an independent competing producer of insurance services.  308 F. Supp. 3d at 1267.  None of the Defendant Insurance Companies simply distribute the products or services produced by others.  Their market allocation scheme eliminates direct horizontal competition between firms that produce the service in question – *i.e.*, providing insurance services to National Accounts.

## XI.   THE PUTATIVE SUBSCRIBER CLASS ACTION SETTLEMENT

305.   Plaintiffs herein do not seek to infringe on the Rule 23(b)(2) indivisible injunctive relief provided to all class members in the putative subscriber MDL class action settlement agreement (the "Settlement Agreement").  The MDL Court has explained that "a Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief." (DE# 2897,  Case No. 2:13-cv-20000-RDP (N.D. Ala.)).  As the MDL Court has further explained, "[t]he relief a Rule 23(b)(3) opt out may pursue is limited only to the extent that such relief

may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court." (*Id.*)

306.   The Settlement Agreement defines the (b)(2) injunctive relief class as "all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period."  Settlement Agreement (ECF 2610-2) ("SA") at § 1.pp (emphasis added).  This expansive class definition includes current and former fully-insured individuals, self-insured individuals, health benefit plans, group accounts, employers, employees (including their spouses and dependents), sponsors, administrators, fiduciaries, trade associations, and both ERISA and non-ERISA plans and participants.  SA at §§ 1.mm, uu, qq, ccc.

307.   Plaintiffs "preserve absolutely their right to litigate." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 385 (1996); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351 (1983); *Butzen v. Mid-States Exp., Inc.,* No. 07 C 5716, 2008 WL 515165, at *2 (N.D. Ill. Feb. 25, 2008) (an opt-out of a class settlement "will not be bound by it"); *In re Inter-Op Hip Prosthesis Liab. Litig*., 204 F.R.D. 330, 353–54 (N.D. Ohio 2001) ("If the claimant timely and properly exercises his opt-out right, he may initiate, continue with, or otherwise prosecute any legal claim against the defendants, without any limitation, impediment or defense arising from the terms of the Settlement Agreement.").

308.  At the MDL Fairness Hearing Defendants affirmed that they "[a]bsolutely [and] totally agree[d]" that "nothing about the approval of [the] settlement affects [opt-outs'] ability to prove in their individual case a Sherman Act violation." Tr. I-169.

309.  Notwithstanding anything set forth above, the individualized injunctive relief that Plaintiffs seek herein is limited to enjoining Defendants from restricting the ability of the Plaintiffs to seek and receive from the Defendant Insurance Companies additional competitive bids for their business.  Plaintiffs seek such an order of injunctive relief only for themselves and not for other National Accounts. Plaintiffs are only asserting divisible injunctive relief and only seeking the ability of the Plaintiff National Accounts to seek and the Defendant Insurance Companies to provide additional competitive bids to Plaintiffs.

## XII.  <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

310.  The statutes of limitation as to Defendants' continuing antitrust violations alleged in this Complaint were tolled by the pendency of one or more class action complaints, and any amendments thereto, against Defendants for the illegal output restrictions and market allocation agreements alleged herein.

## XIII.  <u>VIOLATIONS ALLEGED</u>

### <u>Count One</u>
(*Per Se* Violations of § 1 of the Sherman Act)
(Asserted Against All Defendants)

311.  Plaintiffs repeat and reallege the allegations in all Paragraphs above.

312.   The License Agreements, Membership Standards, Rules and Guidelines agreed to by the individual Defendant Insurance Companies and BCBSA represent horizontal agreements entered into by and between the individual Defendant Insurance Companies, all of whom are actual competitors or potential competitors in the market for National Accounts.

313.   Each of the License Agreements, Membership Standards, Rules and Guidelines entered into between BCBSA and the individual Defendant Insurance Companies represents a contract, combination, and/or conspiracy within the meaning of § 1 of the Sherman Act.

314.   Through the License Agreements, Membership Standards, Rules and Guidelines, BCBSA and the individual Defendant Insurance Companies have combined, conspired, and agreed to limit output and allocate customers and geographic markets for the sale of commercial health insurance services.   In particular, the Defendants have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to: (1) allocate geographic territories or customers among Defendant Insurance Companies and decide through collective action that they will not compete against each other by using the Blue trademarks or trade names for the business of National Accounts; (2) adhere to the National Best Efforts Rule, which directly restricts the non-Blue output that each Defendant Insurance Company is allowed to offer to the market outside of its designated territory; and (3) adhere to the Local Best Efforts Rule, which directly

restricts the non-Blue output that each Defendant Insurance Company can offer within its designated exclusive territory.

315.   Each of the three horizontal agreements specified in the paragraph immediately above is a horizontal agreement among actual or potential competitors that constitutes a *per se* violation of § 1 of the Sherman Act.

316.   As a direct and proximate result of the individual Defendant Insurance Companies and BCBSA's continuing violations of § 1 of the Sherman Act described above, Plaintiffs have suffered antitrust injury in that they have directly paid higher than the competitive rate for services purchased from the Defendants and from other market participants.  These payments have occurred on no less than a monthly basis and each payment to Defendants has caused injury to Plaintiffs.

317.   The Defendant Insurance Companies and the BCBSA are jointly and severally liable to the Plaintiffs in treble the amount of the actual damages suffered by the Plaintiffs plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).  Plaintiffs also seek and are entitled to recover divisible injunctive relief that does not infringe on the indivisible injunctive relief previously award to the Subscriber Class in the case captioned In re Blue Cross Blue Shield Antitrust Litigation, MDL 2406, Case No. 2:13-cv-20000-RDP (N.D. Ala.), as provided for by § 16 of the Clayton Act (15 U.S.C. § 26), and allowed by any judgment entered

by the MDL Court in the aforementioned Subscriber class action suit.  *See* DE#

2897,  Case No. 2:13-cv-20000-RDP (N.D. Ala.)).

**Count Two**
(Rule of Reason Violations of § 1 of the Sherman Act)
(Asserted Against All Defendants)

318.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

319.   The Defendant Insurance Companies have market power (*i.e.*, the

power to profitably raise price above the competitive level) in the sale of U.S. health

insurance services to National Accounts, the relevant geographic and product market

alleged herein.

320. The License Agreements, Membership Standards, Rules, and

Guidelines agreed to by and among the Defendant Insurance Companies represent

horizontal agreements entered into between and among the individual Defendant

Insurance Companies, all of whom are competitors or potential competitors in the

market for commercial healthcare insurance to National Accounts in the United

States and BCBSA.

321.   Each of the License Agreements, Membership Standards, Rules, and

Guidelines entered into between BCBSA and the Defendant Insurance Companies

represents a contract, combination and/or conspiracy within the meaning of § 1 of

the Sherman Act.

322.   Through the License Agreements, Membership Standards, Rules, and

Guidelines, BCBSA and the Defendant Insurance Companies have agreed to and

have, in fact, restricted output and allocated customers, including the Plaintiffs, who purchase commercial health insurance services.  By so doing, Defendant Insurance Companies and the BCBSA have unreasonably injured competition in the relevant market for providing commercial health insurance services to National Accounts within the United States.  In particular, the Defendants' allocation of geographic areas and/or customers and the output restrictions the Defendants have imposed on the market through the National Best Efforts Rule and Local Best Efforts Rule have significantly increased above the competitive level the price paid by National Accounts, including the Plaintiffs, for commercial health care insurance services in the United States.  These output restriction agreements and market allocation agreements unreasonably injure competition within the meaning of § 1 of the Sherman Act.

323.   The output restrictions and market allocation agreements entered into among the individual Defendant Insurance Companies (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are unreasonably anticompetitive and violate the Rule of Reason.

324. Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant market, including but not limited to the following:

a.  Allowing the Defendant Insurance Companies to artificially and unreasonably raise the prices charged to National Accounts substantially above the competitive level;

b.  Substantially restricting output, especially with respect to non-Blue branded plans and competition; and

c.  Depriving the Plaintiffs and others of the benefits of free and open competition, including a greater consumer choice, greater market entry, lower prices, and higher quality services.

325.  The challenged anticompetitive agreements do not provide any procompetitive benefits.  The restraints are also not necessary or ancillary to any purported joint venture among the Defendants.  Furthermore, the anticompetitive agreements are neither ancillary nor necessary to any legitimate or procompetitive conduct or effect or to the ability of the Defendant Insurance Companies to offer commercial health insurance services under a Blue mark or name.

326.  In addition, any possible procompetitive effects that could conceivably result from the output restraint and market allocation agreements alleged herein would be clearly and substantially outweighed by the anticompetitive effects detailed above.   Furthermore, any possible procompetitive effects could be achieved by significantly less restrictive measures.  The output restrictions and market allocation agreements in the License Agreements, Membership Standards, Rules, and Guidelines therefore are not only *per se* illegal, as set forth in Count I

above, but also unreasonably restrain trade in violation of the Rule of Reason.  The combination of and agreements to restrict output, allocate markets, and restrain trade adversely affects Plaintiffs by depriving them, among other things, of the opportunity to purchase health insurance services from a lower cost competitor at a lower price set by a free market unencumbered by Defendants' anti-competitive agreements.  As a result of the Defendant Co-Conspirators' market allocation agreement, National Best Efforts Rule and Local Best Efforts Rule the Defendant Insurance Companies have not competed against each other for National Accounts and have been precluded by such agreement and restraints from doing so.

327.  Likewise, the Defendant Insurance Companies have been precluded from competing for National Accounts both inside and outside of their respective Allocated Territory under non-Blue brands.  This has prevented entry of Defendant Insurance Companies into the market for National Accounts, restricted the output of health insurance services, and raised the prices for such services substantially above what they would have been but for the illegal restraints.

328.  As a direct and proximate result of the Defendant Co-Conspirators' continuing violations of § 1 of the Sherman Act described in this Complaint, Plaintiffs have suffered antitrust injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher prices for commercial health insurance (including but not limited to ASO services) to both the Defendant Insurance Companies and to

other market participants than they would have but for the Defendants unlawful, anticompetitive agreements.  These damages have accrued anew each time Plaintiffs have paid such prices and have been denied the benefits of competition for their ASO contracts.

329.    The Defendant Insurance Companies and the BCBSA are jointly and severally liable to the Plaintiffs in treble the amount of the actual damages suffered by the Plaintiffs plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).  Plaintiffs also seek and are entitled to recover divisible injunctive relief that does not infringe on the indivisible injunctive relief previously award to the Subscriber Class in the case captioned *In re Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, Case No. 2:13-cv-20000-RDP (N.D. Ala.), as provided for by § 16 of the Clayton Act (15 U.S.C. § 26), and allowed by any judgment entered by the MDL Court in the aforementioned Subscriber class action suit. The MDL Court has explained that "a Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief." (DE# 2897, Case No. 2:13-cv-20000-RDP (N.D. Ala.)).   As the MDL Court has further explained, "[t]he relief a Rule 23(b)(3) opt out may pursue is limited only to the extent that such relief may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court." (*Id.*)

## XIV.  **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

a.  Hold the Defendants to be jointly and severally liable to the Plaintiffs and award Plaintiffs treble the amount of the damages they have sustained;

b.  Award Plaintiffs pre-judgment interest;

c.  Award Plaintiffs their costs and attorneys' fees;

d.  Award Plaintiffs such divisible injunctive relief necessary to prevent future loss or harm without infringing upon the indivisible injunctive relief provided to all class members in the putative subscriber class settlement in *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*, Case No. 2:13-cv-20000-RDP (N.D. Ala.);

e.  Adjudge and decree that BCBSA and Defendant Insurance Companies have violated § 1 of the Sherman Act;

f.  Adjudge and decree that the BCBSA has used or is using the Blue Shield trademarks and the Blue Cross trademarks to violate the antitrust laws of the United States; and

g.  Award any such other and further relief as may be just and proper.

**TRIAL BY JURY DEMANDED**

This the 2nd day of May 2022.

Respectfully submitted,


By: */s/ Benjamin T. Presley*
Jay M. Ezelle
H. Thomas Wells, III
Benjamin T. Presley
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
Tel:  (205) 868-6000
Email:  jezelle@starneslaw.com
          twells@starneslaw.com
          bpresley@starneslaw.com

*Counsel for the Plaintiffs*

By: */s/ Paul E. Slater*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois  60603
Tel:   (312) 641-3200
Email:pes@sperling-law.com
          jvanek@sperling-law.com
          dgermaine@sperling-law.com
          ekelly@sperling-law.com

*Counsel for JetBlue Airways Corporation
and JetBlue Airways Group Health
Insurance Plan, The Kraft Heinz Company,
Kraft Heinz Group Benefits Plan, Kraft Heinz
Retiree Group Benefits Plan, and North
Central States Regional Council of
Carpenters' Health Fund*

By*: /s/ Phillip F. Cramer*
Phillip F. Cramer
J. Scott Hickman
Eric G. Osborne
SHERRARD ROE VOIGT & HARBISON,
PLC
150 3rd Avenue South, Suite 1100
Nashville, TN  37201
Tel: (615) 742-4200
Fax: (615) 742-4539
Email:  pcramer@srvhlaw.com
          shickman@srvhlaw.com
          eosborne@srvhlaw.com

*Counsel for The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan, and North Central States Regional Council of Carpenters' Health Fund*

By: */s/ Jason A. Zweig*
Jason A. Zweig
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL  60606
Tel:  (312) 216-8667
Email:  jaz@kellerpostman.com

*Counsel for JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, McLane Foodservice Distribution, Inc., and Employee Benefits Plan of MBM Corporation*